OPINION OF THE COURT
Aileen Haas Schwartz, J.
A reporter for the New York Times seeks access to the fact-finding trial (hereinafter trial) in a juvenile delinquency proceeding. Her application is supported by the Corporation Counsel of the City of New York. Both rely upon Richmond Newspapers v Virginia (448 US 555). The respondent opposes attendance by the reporter as violative of an alleged virtually absolute right to a private trial pursuant to section 741 of the Family Court Act, section 2501.2 of the Uniform Family Court Rules (22 NYCRR 2501.2), and New York practice.
Respondent’s arguments create a jurisprudential warp that is oblivious to Supreme Court and New York Court of Appeals decisions that cast the public and the press in the role of protagonist on the issue of open courts. Richmond Newspapers v Virginia (supra) and Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430) require *437 reconsideration of the law on the right of access of the public and the press to the trial in juvenile delinquency proceedings.
Richmond Newspapers v Virginia (supra) commands respect not only for its holding but for its jurisprudential and conceptual underpinnings. The Supreme Court instructs that all trials, civil and criminal, are presumptively open in vindication of an independent right of access of the public and the press. Indeed, Richmond Newspapers v Virginia (supra, pp 580-581) holds “that the right to attend criminal trials is implicit in the guarantees of the First Amendment * * * Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.”
Footnote 17 (supra, p 580), appended after the above words “criminal trials”, states, “Whether the public has a fight to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open.” Justices White and Stevens joined the opinion of the Chief Justice. In concurring opinions, Justices Brennan, Stewart, Marshall and Stevens expressly expanded the First Amendment protection to all trials, civil as well as criminal. Justice Powell who took no part in the case had expressed that same view earlier in prophetic opinions. (See Powell, J., dissenting in Saxbe v Washington Post Co., 417 US 843, 850; see, also, Powell, J., concurring in Gannett Co. v DePasquale, 443 US 368, 397.)
The opinion of the Chief Justice and the concurring opinions demonstrate unequivocally that the historical and analytical bases for the public right of access in criminal trials pertain equally to civil proceedings. Those grounds reflect a profound Anglo-American commitment to open justice in criminal and civil proceedings. As identified in Richmond Newspapers v Virginia (448 US 555, supra), which treats each ground comprehensively:
1. Historically, Anglo-American trials, civil and criminal, have been conducted in open court, and public access appears to have been the rule in England from time immemorial. English jurists and historians have hailed the *438 openness of judicial trials as “ ‘one of the essential qualities of a court of justice’ ” (448 US, at p 567).
The most striking explicit recognition of openness of trials as part of the fundamental law of the American colonies is contained in the 1677 Concessions and Agreements of West New Jersey: “ ‘That in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner.’ ” (448 US, at p 567; emphasis added.)
The profound concern in the 1677 fundamental law that “justice may not be done in a corner nor in any covert manner” voices the Anglo-American abhorrence of secret trials — the Inquisition, Star Chamber, lettre de cachet. (Matter of Oliver, 333 US 257, 268-270.)
2. The public character of judicial proceedings serves to assure the very integrity of the process. “[I]t has long been recognized as an indispensable attribute of an Anglo-American trial. Both Hale in the 17th century and Blackstone in the 18th saw the importance of openness to the proper functioning of a trial; it gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged peijury, the misconduct of participants, and decisions based on secret bias or partiality.” (Richmond Newspapers v Virginia, 448 US 555, 569, 597, supra.) In a celebrated passage, Jeremy Bentham admonished (1 Bentham, Rationale of Judicial Evidence, p 524): “ ‘Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.’ ” (448 US at p 569.) “The principle that justice cannot survive behind walls of silence has long been reflected in the ‘Anglo-American distrust for secret trials’.” (Sheppard v Maxwell, 384 US 333, 349, cited in 448 US, at p 574, n 9.)
3. Public confidence in the fair and honorable administration of justice is a transcendent value in our system. *439 (Richmond Newspapers v Virginia, supra, p 594.) The trial serves to fulfill “ ‘the notion, deeply rooted in the common law, that “justice must satisfy the appearance of justice” ’ ” (supra, p 594). Public confidence in the administration of justice requires public access to observe judicial processes.
In our Nation, characterized by recourse to the courts for resolution of social and political issues, public interest in judicial proceedings is hardly limited to criminal proceedings. As the court put it with reference to a civil case, Craig v Harney (331 US 367, 374): “A trial is a public event. What transpires in the courtroom is public property.”
The real significance of Richmond Newspapers v Virginia (supra) can best be understood by reference to the case that pervades the opinions there, Gannett Co. v DePasquale (443 US 368, supra), and its extraordinary aftermath. “We begin consideration of this case”, the Chief Justice said (Richmond Newspapers v Virginia, supra, pp 563-564), “by noting that the precise issue presented here has not previously been before this Court for decision. In Gannett Co. v. DePasquale, supra, the Court was not required to decide whether a right of access to trials, as distinguished from hearings on pretrial motions, was constitutionally guaranteed. The Court held that the Sixth Amendment’s guarantee to the accused of a public trial gave neither the public nor the press an enforceable right of access to a pretrial suppression hearing * * * Moreover, the Court did not decide whether the First and Fourteenth Amendments guarantee a right of the public to attend trials * * * nor did the dissenting opinion reach this issue.”
As Justice White who joined the Chief Justice’s opinion bluntly wrote in concurring also (448 US, at pp 581-582), “This case would have been unnecessary had Gannett Co. v. DePasquale, 443 U. S. 368 (1979), construed the Sixth Amendment to forbid excluding the public from criminal proceedings except in narrowly defined circumstances. But the Court there rejected the submission of four of us to this effect, thus requiring that the First Amendment issue involved here be addressed.” It should be noted that the court in Gannett Co. v DePasquale (supra, p 386, n 15) gave *440 as one of the reasons for rejecting the argument of embodiment of the common-law public right of access in the Sixth Amendment that the common-law right was “equally applicable to civil and criminal cases”. Even Justice Stewart who wrote for the court in Gannett Co. v DePasquale (supra) recognized in Richmond Newspapers v Virginia (448 US 555, 599, supra) that a right of access to pretrial suppression hearings in criminal cases may be guaranteed by the First and Fourteenth Amendments.
Richmond Newspapers v Virginia (supra) represents the culmination of a remarkable public dialogue, including statements by members of the Supreme Court, that followed the decision in Gannett Co. v DePasquale (supra). That year-long public discussion amongst the members of the court, legal commentators and the media epitomizes the fundamental structural role of the First Amendment in our system of government. Free expression, exemplified by the debate, constitutes the classic aspect of the First Amendment. Richmond Newspapers v Virginia (supra) recognizes a correlative conceptual right of access of the public and the press to trials conducted by the judicial branch of government as an integral component of the First Amendment.
The analytical foundations of the First Amendment right of access appear virtual truisms: The First Amendment plays a structural role in our system of government. “Implicit in this structural role is not only ‘the principle that debate on public issues should be uninhibited, robust, and wide-open,’ New York Times Co. v Sullivan, 376 U. S. 254, 270 (1964), but the antecedent assumption that valuable public debate — as well as other civic behavior — must be informed.” (Richmond Newspapers v Virginia, supra, p 587 [Brennan, J., concurring].) Or, as earlier conceived by Justice Powell, dissenting in Saxbe v Washington Post Co. (417 US 843, 862-863): “What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs * * * It embodies our Nation’s commitment to popular self-determination and our abiding faith that the surest course for developing sound national policy lies in a free *441 exchange of views on public issues. And public debate must not only be unfettered; it must also be informed.”
Viewed abstractly, the freedom of expression and freedom of access components appear equally commanding because equally vital to the core principles of the First Amendment. Yet, “[w]hile freedom of expression is made inviolate by the First Amendment, and, with only rare and stringent exceptions, may not be suppressed * * * the First Amendment has not been viewed by the Court in all settings as providing an equally categorical assurance of the correlative freedom of access to information”. (Brennan, J., concurring, 448 US, at p 585.) To a great extent, the jurisprudential disparity in development of the right of access component reflects the nature of the countervailing interests at stake, particularly interests of the executive branch in security and confidentiality, and consequently, of the problems posed for resolution in a given factual context. The paradox of the First Amendment right of access lies in its special nature: the applicability of the principle seems all-inclusive, yet the reality of application does not permit standards for universal implementation. The right is fundamental but not absolute; the countervailing interests are often complex and of great force, yet without constitutional statute. Thus, although the substantially divergent views held by members of the Supreme Court on the subject in earlier cases dealing with the other branches of government represent philosophical differences, all admit the special nature of a First Amendment claim of access. (See, e.g., opns in Saxbe v Washington Post Co., 417 US 843.)
Richmond Newspapers v Virginia (supra) is, indeed, a “watershed case” (Stevens, J., concurring, supra, p 582), because the Supreme Court squarely addresses the First Amendment right of access issue and endeavors to formulate guidelines in this otherwise largely uncharted area.
The New York Court of Appeals served as a vital participant in the grand debate sparked by Gannett Co. v DePasquale (443 US 368, supra). Its major contribution, Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430, supra), decided some seven months before Richmond Newspapers v Virginia (448 US 555, supra), ranks as the *442 common-law analogue of Richmond Newspapers v Virginia (supra). (See Matter of Hearst Corp. v Clyne, 50 NY2d 707.)
Matter of Westchester Rockland Newspapers v Leggett (supra), like Richmond Newspapers v Virginia (supra), decides an issue of right of access to a criminal proceeding but addresses the common-law right of access of the public and the press to all proceedings, civil and criminal. (The Court of Appeals concluded that an order excluding the public and the press from a pretrial competency hearing in a criminal case in which the accused was charged with rape constituted error.) Indeed, Matter of Westchester Rockland Newspapers v Leggett (supra) expressly reformulates the New York law of the right of access of the public and the press to all judicial proceedings, civil and criminal, and prescribes procedural standards for judicial evaluation of opposition to the presumptive openness of all judicial proceedings. As such, Matter of Westchester Rockland Newspapers u Leggett (supra) represents the culmination of the juridical development of the common-law right of access of the public to judicial proceedings.
Appreciation of the force of the right delineated in Matter of Westchester Rockland Newspapers v Leggett (supra), requires an awareness of the somewhat anomalous legal history of the New York public trial rule. New York is one of the very few States that does not have a State constitutional provision for right to a public trial akin to the Sixth Amendment to the United States Constitution. (See People v Jones, 47 NY2d 409, 411, n 1.) Thus, the “New York public trial right” in both facets, the right of the accused or parties in a civil case and the right of the public, is grounded in the common law embodied in statutory provisions, derived from the revised statutes of 1829. (See People v Jelke, 308 NY 56, 62.) The matrix statute, characterized in 1829 as “[declaratory of the existing law” (supra, p 62) is section 4 of the Judiciary Law which provides: “The sittings of every court within this state shall be public, and every citizen may freely attend the same”. Amendments in 1879 and in 1945 added to section 4 “except that in all proceedings and trials in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, sodomy, bastardy or filiation, the court may, in its discretion, *443 exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court.” (Matter of United Press Assns. v Valente, 308 NY 71, 79, 92; People v Jelke, supra, p 64; see, also, Civil Rights Law, § 12.)
In 1954, the Court of Appeals in People v Jelke (308 NY 56, supra) reversed the judgment in a criminal proceeding upon the ground that an order of exclusion of the public and the press in “ ‘the interests of good morals’ ” violated the accused’s statutory right to a public trial. People v Jelke (supra) antedated the applicability of the Sixth Amendment to the United States Constitution to the States. Nevertheless, the Court of Appeals (308 NY, at pp 64-65) refused to adopt the argument that exclusion was authorized by the exceptions to section 4 of the Judiciary Law, and emphasized that “the right of public trial is of such surpassing importance that any statute purporting to limit or qualify that right should be ‘strictly construed in favor of the general principle of publicity.’ ” (308 NY, at p 65.) Moreover, the court implicitly questioned the propriety of the statutory exceptions to the accused’s right to a public trial (supra, p 68).
Of particular pertinence to the significance of Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430, supra) is the Court of Appeals decision in the companion case to People v Jelke (supra), decided on the same day. That case, Matter of United Press Assns. v Valente (supra), which concerned the same order of exclusion, treated the challenge of a number of press associations and newspaper publishers. At the very outset, the Court of Appeals rejected the claim that right of access of the public and the press is embraced within the constitutional guarantees of free speech or freedom of the press. (308 NY, at p 77.) The New York public trial right, the court stated (supra, p 80), is personal to the accused in a criminal proceeding and to the parties in a civil case and may be invoked only by them. The Court of Appeals thus refused to recognize an enforceable independent right to access of the public and the press notwithstanding the plain language of section 4 of the Judiciary Law.
*444 In Matter of Westchester Rockland Newspapers v Leggett (supra, p 443), the Court of Appeals declined to reconsider the decision in Matter of United Press Assns. v Valente {supra), rejecting the argument of a First Amendment guarantee of a right of access of the public and the press, “because * * * unnecessary to do so.” However, Matter of Westchester Rockland Newspapers v Leggett (supra) expressly repudiates the interpretation of section 4 of the Judiciary Law adopted in Matter of United Press Assns. v Valente (308 NY 71, supra) by declaring (pp 437-438): “[Sjection 4 of the Judiciary Law provides: ‘The sittings of every court within this state shall be public, and every citizen may freely attend the same.’ This we have held is a right which may be asserted by the public and the press in civil * * * and criminal cases”.
Under Matter of Westchester Rockland Newspapers v Leggett (supra, p 438), “[a]ll court proceedings are presumptively open”, and a heavy burden of proof lies with the opponent to open proceedings. “Should the court decide that it is necessary to close the hearing in order to protect the defendant’s rights or pursuant to section 4 of the Judiciary Law, the reasons for closure shall be given in open court” (supra, p 442).
Hence, even prior to Richmond Newspapers v Virginia (448 US 555, supra), Matter of Westchester Rockland Newspapers v Leggett (supra) identified the public and the press as the protagonists and placed a heavy burden on the one seeking closure. A fortiori now that the right of access of the public and the press has been invested with constitutional statute.
Respondent’s request for closure must be viewed within the context of both Richmond Newspapers v Virginia (supra) and Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430, supra). Significantly, the Supreme Court and the Court of Appeals voiced the same caveat regarding implementation of the newly formulated rights: the right of access of the public and the press is not absolute. (See, e.g., 448 US, at p 581, n 18; p 598, ns 23, 24; p 600, n 5.) The difficult task of striking the proper balance between competing rights continues as the traditional role of the Judge.
*445 To fulfill that function requires evaluation of the respondent’s arguments for closure: the respondent in a juvenile delinquency proceeding possesses a virtually absolute right to a private trial, and publicity, in transforming “private litigation” into a public matter, constitutes punishment, and hence is repugnant to the essence of juvenile court philosphy.
Respondent is 15 years of age. The petition alleges acts that would constitute attempted assault of a teacher in a public school (Penal Law, §§ 110.00, 120.00). The reporter states that her interest is in the court generally and not in any case. She further states that she will not use the names or otherwise identify parties or witnesses in the case in any article. Her statements are not challenged.
Subdivision (b) of section 741 of the Family Court Act and section 2501.2 of the Uniform Family Court Rules (22 NYCRR 2501.2) are cited as the primary legal sources of the alleged right to closure. Subdivision (b) of section 741 of the Family Court Act states: “The general public may be excluded from any hearing under this article and only such persons and the representatives of authorized agencies admitted thereto as have a direct interest in the case.” Section 2501.2 of the Uniform Family Court Rules (22 NYCRR 2501.2), “Privacy of proceedings in the Family Court,” prescribes guidelines for exercise of the discretion vested by section 741 of the Family Court Act in the Judge presiding. Section 741 of the Family Court Act is congruent in form and substance with the “exceptions” clause of section 4 of the Judiciary Law and other statutory provisions permitting closure in the discretion of the Judge presiding. (See, e.g., CPL 180.60; Domestic Relations Law, § 235; Family Ct Act, §§ 531, 1043.) In addition to those provisions permitting discretionary departure from the common-law open court rule, there are distinct statutory provisions that provide for privacy of records. (See, e.g., Domestic Relations Law, § 235; Family Ct Act, § 166; Mental Hygiene Law, § 9.31,. subd [f].)
Section 741 of the Family Court Act conforms to the legislative pattern permitting departure from the common-law open courts rule at the discretion of the Judge presiding in certain designated proceedings. It would appear that *446 section 741 of the Family Court Act has served a distinctive juvenile court philosophy of absolute privacy. In the view of the founders of juvenile court, absolute privacy was essential to the goal of rehabilitation of the juvenile. Secret hearings soon became the distinguishing hallmark of juvenile delinquency proceedings.
Almost 15 years ago, the Supreme Court in Matter of Gault (387 US 1) examined the rhetoric and the realities of juvenile delinquency proceedings and rejected the role model of the Judge qua benevolent parent and the role model of the court qua social agency as violative of due process at the adjudication stage. The due process deficiencies of the generally, if not universally, secret proceedings were graphically characterized (387 US, at p 18): “Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: ‘The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts’ ”.
Matter of Gault (supra) and its progeny have defined the due process requirements of juvenile delinquency proceedings at the adjudicatory stage, i.e., in New York, the trial adjudicating whether the juvenile committed an act defined as a crime by the Penal Law. With the notable exception of the Sixth Amendment right of trial by jury and right to a public trial, the trial is a virtual procedural facsimile of a criminal trial. (See McKeiver v Pennsylvania, 403 US 528.)
Notwithstanding Matter of Gault’s voiced concerns regarding secret adjudicatory hearings, the practice of automatic absolute closure has not ended. In New York, neither section 741 of the Family Court Act nor section 2501.2[1] of the Uniform Family Court Rules (22 NYCRR 2501.2) nor any other statutory provision envisages such standard. The State’s special concern for the juvenile is evident. Nevertheless, the provisions treating privacy or confidentiality of records contain exceptions in the public interest. *447 (See, e.g., Family Ct Act, §§ 783, 784.) Moreover, not only does section 741 of the Family Court Act require the exercise of judicial discretion for exclusion of the “general public”, but the section 2501.2 guidelines for exercise of judicial discretion to admit “persons” and “representatives” pursuant to section 741 of the Family Court Act suggest admission of “representatives of the news media”.[2] It must further be noted in evaluating respondent’s application for absolute closure that recent amendments have substantially changed the focus of juvenile delinquency proceedings in New York. (See L 1976, ch 878.) Symbolic of that change, section 711 of the Family Court Act, which is entitled “Purpose” and embodies New York State public policy, was amended in 1976 to mandate court consideration of the “need for protection of the community” as well as the “needs and best interests of the respondent” (L 1976, ch 878, § 2; see, also, Family Ct Act, § 724-a, “Fingerprinting of certain alleged juvenile delinquents”; § 782-a, “Transfer of records and information to institutions and agencies”). At the very least, that amendment to section 711 of the Family Court Act suggests the appropriateness of reconsideration of the views that the conduct of juvenile delinquency trials is not a matter of legitimate public interest and that a juvenile delinquency proceeding is “private litigation”.
Recent studies and proposed standards present such reevaluation of the “public element” in juvenile delinquency proceedings.[3] Reminiscent in appraisal and reasoning of Matter of Gault (387 US 1, supra), the studies recommend departure from the classic principle of absolute closure of adjudication proceedings. The prestigious Institute of Judicial Administration-American Bar Association Joint Commission on Juvenile Justice Standards, composed of representatives from the legal profession and the behavioral sciences, recommends express legal recognition of the juve *448 nile’s right to a public trial. (IJA/ABA Juvenile Justice Standards Project: Standards Relating to Adjudication, Part VI, Standard 6.1.) The commentary to Standard 6.1 “Right to a public trial” explains: “[Bjecause both model legislation and many state statutes allow for the presence of ‘interested persons’ at the judge’s discretion * * * juvenile hearings cannot truly be described as confidential. Frequent attendance by students, social workers, lawyers, and observers of the court system indicates that one need not be ‘interested’ in the child in order to qualify as an ‘interested person.’ This practice vitiates the promise of confidentiality, without giving the benefits of a truly open hearing.” (IJA/ABA Juvenile Justice Standards Project, Standards Relating to Adjudication, p 71.) As approved in 1979 by the House of Delegates, American Bar Association, the pertinent standards and commentaries distinguished “between the respondent’s election to waive the right to a public trial and an absolute right to a closed trial.” {Id., pp xii, 70-76.) Subdivision B of Standard 6.2 prescribes discretionary judicial authority “to permit members of the public who have a legitimate interest in the proceedings or in the work of the court, including representatives of the news media,[4] to view adjudication proceedings when the respondent has waived the right to a public trial.”
Those advocates of the “public element” as a positive facet of juvenile adjudicatory hearings premise that proposition primarily upon the interests of the juvenile. (Ibid.) Thus, the rationale for that conclusion adopts the very bases that underlie the Sixth Amendment right to a public trial, to wit, enhancement of the integrity of the proceeding and deterrence of abuse of judicial process. Those safeguards appear particularly pertinent within the context of legislative changes, such as those in New York, that affect the very nature of juvenile delinquency proceedings. Public access to juvenile trials does not mean abandonment of the goal of rehabilitation. Nor does it signal an end to the *449 salutary differences between juvenile delinquency adjudication and criminal court conviction. Just as the fair trial-free press cases recognize the ultimate responsibility of the court to define standards to vindicate the fundamental right to a fair trial without unduly burdening the equally fundamental First Amendment right of the press, so too, must the court strike the proper balance in promoting the State’s special interest in the juvenile. A project akin to the fair trial and free press standards appears indicated. (2 ABA Standards for Criminal Justice [2d ed], ch 8 [Fair Trial and Free Press]; see Smith v Daily Mail Pub. Co., 443 US 97, 105, n 3.) Public access to juvenile trials need not affect the confidentiality of records,[5] nor, indeed, need the anonymity of the juvenile be sacrificed.
There is no constitutional impediment to public trial for juveniles. (McKeiver v Pennsylvania, 403 US 528, 547, 554-557, supra [Brennan, J., concurring].) To try a juvenile in secret in opposition to his demand for a public trial would appear to be repugnant to due process. It is now well established, however, that the converse would not constitute a constitutional deprivation. Even prior to Richmond Newspapers v Virginia (448 US 555, supra), the Supreme Court noted in Gannett Co. v DePasquale (443 US 368, 382, supra), “While the Sixth Amendment guarantees to a defendant in a criminal case the right to a public trial, it does not guarantee the right to compel a private trial.” Equally clear, a juvenile in a delinquency proceeding does not have a constitutional right to a private trial.
Nor is the juvenile’s “right of confidentiality” constitutional in nature. (See McKeiver v Pennsylvania, supra, p 547.) Supreme Court jurisprudence does acknowledge a legitimate State interest in rehabilitation of juvenile delinquents, in protecting juvenile delinquents from the stigma and consequences of conviction in the criminal court and in confidentiality of juvenile delinquency adjudication and records (supra). But although sympathetic to the State’s interest in juveniles, the Supreme Court has found that interest wanting when measured against the *450 First Amendment right of the press to publish an alleged juvenile delinquent’s name lawfully obtained (Smith v Daily Mail Pub. Co., 443 US 97, supra), when measured against the First Amendment right of the press to publish information obtained in an open juvenile delinquency proceeding (Oklahoma Pub. Co. v District Ct., 430 US 308), and when measured against a defendant’s Sixth Amendment right to cross-examine for bias including exposure of the witness’ adjudication as a juvenile delinquent (Davis v Alaska, 415 US 308). (See, also, Cox Broadcasting Corp. v Cohn, 420 US 469.)
Respondent presents no other legal basis for the argument that mere invocation by a juvenile of a right of privacy ipso facto overcomes the claim of the press. Whatever the practice of private or semiprivate adjudicatory proceedings, the claim of the press serves as the catalyst for re-examination of that policy particularly within the context of recent major jurisprudential developments. The claim of the press comes to the court with the command of Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430, supra), and the force oí Richmond Newspapers v Virginia (supra). Matter of Westchester Rockland Newspapers v Leggett (supra) declares that all court proceedings are presumptively open in the name of the right of the public and press to attend. Richmond Newspapers v Virginia (supra) recognizes the right of the public and the press as guaranteed by the First Amendment. Granted, the holding in Richmond Newspapers v Virginia (supra, p 580) was limited to criminal trials, the precise issue before the court. Yet, the unmistakable force of Richmond Newspapers v Virginia (supra) virtually compels the greatest if not governing effect in all court trials. Together, Richmond Newspapers v Virginia (448 US 555, supra) and Matter of Westchester Rockland Newspapers v Leggett (supra) confirm the presumptive openness of juvenile trials as a public and press right of the highest magnitude.
Under all the circumstances, the respondent has failed to overcome that presumption of openness of the trial. The court staff is directed not to use the respondent’s or witnesses’ names within the hearing of the reporter. The *451 Corporation Counsel and the Law Guardian agree to make every effort to ensure that no names will be used during the proceeding.

. The drafters of the rules, the Family Court Advisory and Rules Committee, listed “Family Court Act sections 531, 741 and 1043; Judiciary Law § 4” as “statutory authority” for section 2501.2. (Proposed Uniform Rules for the Family Court of the State of New York, p 3 [1976].)

. To the extent that a guideline may be inconsistent with section 741 of the Family Court Act or with constitutional principles a problem may be posed that fortunately is not present in the instant matter.

. See McLaughlin and Whisenand, Jury Trial, Public Trial and Free Press in Juvenile Proceedings: An Analysis and Comparison of the IJA/ABA, Task Force and NAC Standards, 46 Brooklyn L Rev 1; see, also, as to other jurisdictions, id., pp 10-12.

. Whether greater access rights may constitutionally be granted to the press than to the public remains unresolved. See Richmond Newspapers v Virginia, 448 US 555, 586, n 2; Gannett Co. v DePasquale, 443 US 368, 391; Houchins v KQED, Inc., 438 US 1; Saxbe v Washington Post Co., 417 US 843; Pell v Procunier, 417 US 817.

. On related issues pertaining to the common-law right to public records, see Nixon v Warner Communications, 435 US 589; Matter of National Broadcasting Co. v Myers, 635 F2d 945, application for stay den 449 US 895.