41255. FLORIDA PUBLISHING COMPANY v. MORGAN.
(322 SE2d 233)

MARSHALL, Presiding Justice.

This case draws into question the constitutionality of two Georgia statutory provisions which relate to juvenile-court proceedings. One of these provisions excludes the public from delinquency, deprivation, and unruliness hearings in juvenile court. OCGA § 15-11-28 (c). The other provision prohibits the name or picture of a child under juvenile-court jurisdiction for the first time from being made public by any news media except as authorized by court order. OCGA § 15-11-60 (g) (1). The trial court entered an order upholding the constitutionality of the former provision and refusing to rule on the constitutionality of the latter provision. For reasons which follow, we reverse.

On or about February 8, 1984, two youths — Morris Lewis (13 years old) and Clyde McVeigh (12 years old) — commandeered the Cumberland Island ferry and sailed it to Nassau County, Florida. They were apprehended and arraigned in Duval County, Florida, and transferred to juvenile court in Camden County, Georgia. Their names and photographs were published in the Florida Times Union and the Jacksonville Journal, which are distributed in Camden County and throughout southeast Georgia. These two newspapers are

---

Scindia, supra.

published by the Florida Publishing Company, and Gray Thomas is a reporter for the Florida Publishing Company.

On February 14, a juvenile-court hearing was held in Camden County Juvenile Court concerning these youths. Gray Thomas sought to attend the hearing, but he was barred by the juvenile-court judge under the authority of OCGA §§ 15-11-28 (c) and 15-11-60 (g) (1), supra. He was also denied the right to inspect the case files after the hearing had been completed.

OCGA § 15-11-28 (c) provides as follows: "The general public shall be excluded from hearings involving delinquency, deprivation, or unruliness. Only the parties, their counsel, witnesses, persons accompanying a party for his assistance, and any other persons as the court finds have a proper interest in the proceeding or in the work of the court may be admitted by the court. The court may temporarily exclude the child from the hearing except while allegations of his delinquency or unruly conduct are being heard." OCGA § 15-11-60 (g) (1) provides that: "The name or picture of any child under the jurisdiction of the court for the first time shall not be made public by any news media, upon penalty of contempt under Code Section 15-11-62, except as authorized by an order of the court." In line with OCGA § 15-11-60 (g) (1), supra, OCGA § 15-11-60 (g) (2) provides: "It shall be mandatory upon the judge of the juvenile court to release the name of any child who is under the jurisdiction of the court for a second or subsequent time. No person, firm, or corporation shall be guilty of any offense by making public the name or picture of any such child."

The Florida Publishing Company responded by filing a petition for mandamus against the juvenile court judge in the Camden Superior Court. In the petition for mandamus, the plaintiff requests that the previously cited statutory provisions be declared unconstitutional insofar as they require all juvenile-court hearings to be closed to the public and that the juvenile-court judge be ordered to show cause why he should not be required to open for public inspection the case files in controversy here.

After conducting a hearing, the superior court ruled that OCGA § 15-11-28 (c), supra, is constitutional in its closure of juvenile hearings from public view or inspection. Since no contempt order has been issued against the defendant for its publication of the names of the juveniles here, the court refused to consider the constitutionality of OCGA § 15-11-60 (g) (1), supra. This appeal follows.

The remainder of this opinion can best be divided into: (1) Judicial Decisions Concerning Constitutional Questions Raised, and (2) Our Holdings.

*Judicial Decisions Concerning Constitutional Questions Raised.*

(a) One of the seminal decisions involving juvenile-court proceedings is certainly In re Gault, 387 U. S. 1 (87 SC 1428, 18 LE2d 527) (1967). There it was held that where the proceedings may result in the incarceration of the juvenile offender, certain due process requirements must be observed. In the course of rendering its decision, the Court noted that historically there have been wide differences between the procedural rights accorded to adults and those of juveniles. Although this difference in treatment ostensibly has been for the juveniles' protection, the Gault court found it to be debatable whether this Star-Chamber type secrecy of juvenile-court proceedings has in fact redounded to the juveniles' benefit. Finding the claim of secrecy in juvenile court and police records concerning juveniles to be "more rhetoric than reality," the Court held, "In any event, there is no reason why, consistently with due process, a State cannot continue, if it deems it appropriate, to provide and to improve provision for the confidentiality of records of police contacts and court action relating to juveniles." 387 U. S. at 25.

(b) In Cox Broadcasting v. Cohn, 420 U. S. 469 (95 SC 1029, 43 LE2d 328) (1975), it was held that the state may not, consistent with the First and Fourteenth Amendments, impose sanctions on the accurate publication of a rape victim's name from judicial records that are themselves open to public inspection.

However, in the course of rendering Cox, the court noted: "If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish." 420 U. S. at 496. (Footnote omitted.)

(c) Although Smith v. Daily Mail Publishing Co., 443 U. S. 97, 102 (99 SC 2667, 61 LE2d 399) (1979), can be described as a narrow decision turning on its facts, it applies a rule that "State action to punish the publication of truthful information . . . seldom can satisfy constitutional standards."

In Smith, a West Virginia statute made it a crime for a newspaper (but not other news media) to publish, without written approval of juvenile court, the name of any youth charged as a juvenile offender even when, as in Smith, the name was lawfully obtained by monitoring police band radio frequencies and interviewing witnesses.

The asserted state interest in the closure of the hearing was the protection of the anonymity of the juvenile offender in order to further his or her rehabilitation. As to these interests, the Court responded, "The sole interest advanced by the State to justify its crimi-

nal statute is to protect the anonymity of the juvenile offender. It is asserted that confidentiality will further his rehabilitation because publication of the name may encourage further antisocial conduct and also may cause the juvenile to lose future employment or suffer other consequences for this single offense. In Davis v. Alaska, 415 U. S. 308 [94 SC 1105, 39 LE2d 347] (1974), similar arguments were advanced by the State to justify not permitting a criminal defendant to impeach a prosecution witness on the basis of his juvenile record. We said there that '(w)e do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender.' Id. at 319, [94 SC at 1112]. However, we concluded that the State's policy must be subordinated to the defendant's Sixth Amendment right of confrontation. Ibid. The important rights created by the First Amendment must be considered along with the rights of defendants guaranteed by the Sixth Amendment. See Nebraska Press Assn. v. Stuart, 427 U. S. at 561 [96 SC at 2803]. Therefore, the reasoning of Davis that the constitutional right must prevail over the state's interest in protecting juveniles applies with equal force here." Smith, 443 U. S., supra at 104.

(d) In Gannett Co. v. DePasquale, 443 U. S. 368 (99 SC 2898, 61 LE2d 608) (1979), the immediate question for decision concerned closure by the trial judge of a pretrial suppression hearing in a murder trial at the behest of the defendant, and without objection by the prosecuting attorney. The closure was found to be necessary to protect the defendant's right to a fair trial.

Five members of the Court had no trouble in ruling that although the Sixth Amendment supposes that criminal trials will be open to the public, no right of access belongs to the public (at least under the facts of that case). However, the majority did suggest that a right of access exists under the First Amendment, but it was held that in ordering closure the trial judge properly balanced this right of access against the defendant's right to a fair trial.

Four concurring opinions differentiated between pretrial suppression hearings and the trial itself. Under this plurality view, a study of English and Colonial history shows that the public (with the news media as its agents or surrogates) has the right of access to criminal trials, either under the First or Sixth Amendments. However, as to pretrial hearings to suppress evidence, closure of the hearing may be acutely necessary to prohibit the dissemination of prejudicial, inadmissible evidence, and such hearings are creatures of the twentieth century wholly unanticipated by the framers of the Constitution. Thus, under this view, the closure of pretrial suppression hearings to the public cannot be considered contrary to the history of the Bill of Rights.

(e) In Richmond Newspapers, Inc. v. Virginia, 448 U. S. 555 (100 SC 2814, 65 LE2d 973) (1980), the Court, in a three-four-two decision, held that a trial court in Virginia had acted in violation of the First Amendment when it excluded the press and public from a murder trial. Distinguishing Gannett Co. v. DePasquale, supra, the Court held that, "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." 448 U. S. at 581. The Court found the presumptive openness of trials to be an attribute of the judicial systems of England and Colonial America.

(f) In Globe Newspapers v. Superior Court of Norfolk County, 457 U. S. 596 (102 SC 2613, 73 LE2d 248) (1982), the Court, in a five-one-three decision, held that under the First Amendment there does exist a right of access to criminal trials on the part of the press and general public.

Globe Newspapers involved a Massachusetts statute requiring trial judges, at trials for specified sexual offenses involving victims under the age of 18, to exclude the press and general public from the courtroom during the testimony of the victim. The Court stressed that the criminal trial historically has been open to the press and general public, and it elaborated upon the myriad ways in which the openness of criminal trials is an attribute which serves to make the criminal justice system function appropriately under our system of democratic government.

The Court acknowledged that the right of access to criminal trials, though of constitutional status, is not absolute. However, the Court held that where the state attempts to deny the right of access to criminal trials in order to inhibit the disclosure of sensitive information, "it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." 457 U. S., supra at 607.

The state's interests advanced to support the Massachusetts statute were the encouraging of minor victims of sex crimes to come forward and give accurate testimony, as well as the protection of minor victims from embarrassment and trauma. As to the latter interests, the Court found that the Massachusetts statutory scheme did not support it, because the victim's testimony became a public record. As to the former interest, the Court found that it did not justify exclusion of press and public from courtrooms at all sex crimes trials where a victim under the age of 18 is testifying, since the trial judge can determine on a case-by-case basis whether closure is necessary to protect the welfare of the minor victim.

(g) In *R. W. Page Corp. v. Lumpkin*, 249 Ga. 576 (292 SE2d 815) (1982), we explored the parameters of authority possessed by a Georgia superior court under our state Constitution in ordering closure of a criminal trial, as well as pre-trial and post-trial hearings. We noted

that, "[a]lthough the sixth amendment to our federal constitution (Code Ann. § 1-806) affords the accused a right to a public trial, our state constitution point-blankly states that criminal trials *shall* be public. Const. of Ga. 1976, Art. I, Sec. I, Par. XI (Code Ann. § 2-111)." 249 Ga. at 578 (3) (Footnote omitted.). We thus held that a "strong presumption [favors] the general rule, which is that in Georgia, the criminal trial itself, and all its consequent hearings on motions (pre-trial, mid-trial and post-trial) shall be open to the press and public on equal terms unless the defendant or other movant is able to demonstrate on the record by 'clear and convincing proof' that closing the hearing to the press and public is the only means by which a 'clear and present danger' to his right to a fair trial or other asserted right can be avoided." Id. at 579 (4).

(h) In Press-Enterprise Co. v. Superior Court of California, Riverside County, 52 Law Week 4113 (decided Jan. 18, 1984), the Court found that voir dire proceedings are a phase of a criminal trial which are presumptively open under the Richmond Newspapers and Globe Newspapers decisions. The Court held that this "presumption of openness [had not been] overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." 52 Law Week at 4115-4116.

### *Our Holdings.*

1. We reach the issue of the constitutionality of OCGA § 15-11-60 (g) (1), supra, because, even though no contempt order has been issued here, the question concerning the statute's constitutionality has been raised, and the resolution of the question is of importance to the administration of our criminal-justice system. Therefore, the issue will be decided even though it may be technically moot. See *R. W. Page*, supra, and cits.; Globe Newspapers, supra, and cits.

2. The holdings, primarily in the Richmond Newspapers case, Globe Newspapers case and *R. W. Page* case, create a presumption that criminal trials will be open to the public. As we have previously stated, part of the rationale of these holdings is that, at English common law and in Colonial America, trials have been open to the public for reasons which, throughout history, have fostered and continue to foster a role for the judiciary appropriate to our scheme of constitutional government.

However, in their relatively brief history, it would appear that juvenile proceedings have been closed to the public. Therefore, we are unable to conclude that there is any historically-based constitutional presumption of openness applicable to juvenile-court proceedings. This, however, does not mean that the absolute closure of juvenile-

court hearings passes constitutional muster.

From the various cited cases, we conclude that, consistent with the Constitution, the state may create a rule that delinquency, deprivation, and unruliness hearings in juvenile court are presumed closed to the public (and press). However, for constitutional reasons, this presumption cannot be conclusive. The public and/or press must be given an opportunity to show that the state's or juveniles' interest in a closed hearing is not "overriding" or "compelling."

In this case, the appellant concedes that, "It is not likely that the public or the press would have any interest in attending 99 out of 100 [juvenile] cases"; that "it is unnecessary in juvenile proceedings to determine closure or openness of the proceeding on a case-by-case basis"; and that "the burden in juvenile cases could be placed on the public-press to first request the right to attend."

We, therefore, hold that where a member of the public or press institutes a judicial proceeding to require the opening of a juvenile hearing, the court must in an expeditious manner give the public or press an opportunity to present evidence and argument to show that the state's or juveniles' interest in a closed hearing is overridden by the public's interest in a public hearing. The juvenile court's ruling on this question must be composed of "findings in writing articulate enough for appellate review." Richmond Newspapers, 448 U. S. at 581, supra; Press Enterprise, 52 U. S. Law Week, supra, at 4115-4116.

3. As to the constitutionality of OCGA § 15-11-60 (g) (1), supra, we agree with the opinion of the Attorney General that it was invalidated by Smith v. Daily Mail, 443 U. S. 97, supra; Op. Atty. Gen. 80-11.

*Judgment reversed. All the Justices concur, except Weltner, J., who dissents.*

DECIDED OCTOBER 31, 1984.

*Hull, Towill, Norman & Barrett, David E. Hudson,* for appellant.
*Michael J. Bowers, Attorney General, David C. Will, Assistant Attorney General,* for appellee.

WELTNER, Justice, dissenting.

I dissent, because I believe the sounder approach is to have but one rule for criminal cases and juvenile matters alike, and that being the rule handed down in *R. W. Page Corp. v. Lumpkin,* 249 Ga. 576 (292 SE2d 815) (1982).

I point out that the extension of *R. W. Page* to juvenile matters is in keeping with the importance that our state has placed upon the openness of judicial proceedings. Further, inasmuch as there is no potential panel of veniremen to be tainted by undue publicity, open

courtrooms present even less danger in juvenile matters than in criminal prosecutions.

As the majority seems to concede that no more than one out of a hundred juvenile matters would attract public attention (majority opinion, p. 473), it would seem more feasible that the procedure of *R. W. Page* should be adopted here, rather than the new rule as specified by the majority.