[No. E009021. Fourth Dist., Div. Two. July 12, 1991.]

SAN BERNARDINO COUNTY DEPARTMENT OF PUBLIC
SOCIAL SERVICES et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE SUN NEWSPAPER, Real Party in Interest.

## Counsel

Alan K. Marks, County Counsel, Linda C. Stern, Deputy County Counsel, David L. McKenna, Public Defender, Joseph M. Petrasek, Deputy Public Defender, Juarez & Vega, John N. Vega, Howard, Friedman & Gebbie and Gloria Gebbie for Petitioners.

No appearance for Respondent.

Thompson & Colegate and James D. Ward for Real Party in Interest.

## Opinion

**HOLLENHORST, Acting P. J.**—In this case, we hold that the constitutionally protected public right of access to trials and pretrial proceedings in criminal cases does not extend to juvenile dependency proceedings. However, members of the press are persons having a "direct and legitimate interest in the work of the court" and may be permitted to attend such proceedings in the exercise of the juvenile court's discretion under Welfare and Institutions Code[1] section 346. In this case, however, the juvenile court abused its discretion in allowing The Sun Newspaper (Sun), real party in interest, to attend the proceedings subject to limitations on its right to investigate and publish.

### Facts

On October 24, 1990, petitioner, Department of Public Social Services for the County of San Bernardino (DPSS), filed petitions pursuant to section 300 to have the seven minor children of Joseph S. and Sandra S. declared dependents of the juvenile court. The primary basis for each of the petitions was allegations of neglect and abuse by the parents against their daughter,

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Rose S. According to reports published in the Sun, Rose had been kept locked in a closet by the parents for most of 10 years. When she was found, Rose was lying in her own feces and in urine-stained clothes. The Sun ran numerous articles about the incident, and the case gained some national attention as well.

On November 29, 1990, the Sun filed a request for access to the juvenile court's files and records regarding the minors. DPSS, the minors and the parents (hereinafter, petitioners) opposed access and a hearing was held on the issue of whether the Sun would be permitted access to the court files and records and to the court proceedings.[2] At the hearing the court took evidence regarding the effects further publicity would have on the minors and on reunification efforts by the family.

The following day the court issued its order denying the Sun access to the court records and files. However, it granted the Sun permission to attend the court proceedings but prohibited the Sun from (1) publishing the names of any of the minors; (2) publishing any likeness, characters, cartoons or photographs of the minors; (3) interviewing any of the minors unless their attorney is present; (4) interviewing the minors' caretakers in front of the minors; (5) interviewing any mental health professional to whom the minors had been referred; and (6) in the future, doing any act which might interfere with reunification or have a negative impact upon the providing of reunification services.

Petitioners thereupon filed this petition for writ of mandate or prohibition contending that the juvenile court, respondent herein, erred and/or abused its discretion in allowing the Sun to attend the court proceedings. The Sun contends that respondent court's order permitting access to the proceedings was proper but that the conditions imposed on that permission are unconstitutional.

## SECTION 346

 Preliminarily, we dispose of petitioners' contention that section 346[3] does not authorize the juvenile court to admit members of the press to

---

[2]The record is not clear whether the Sun had requested access to the proceedings or whether this issue was raised by the court. In the verified petition, petitioners allege that on November 26, 1990, the Sun had, through counsel, requested permission to attend the proceedings. In its unverified return, the Sun suggested that the issue of access to the court proceedings was raised by the juvenile court on its own motion. For our purposes, it is unnecessary to resolve this conflict.

[3]Section 346 reads as follows: "Unless requested by a parent or guardian and consented to or requested by the minor concerning whom the petition has been filed, the public shall not be

juvenile dependency proceedings. A similar contention made in connection with a juvenile delinquency proceeding was rejected by the California Supreme Court in *Brian W.* v. *Superior Court* (1978) 20 Cal.3d 618 [143 Cal.Rptr. 717, 574 P.2d 788].

In *Brian W.*, the court discussed press access to a juvenile delinquency proceeding under section 676. This section provided that " 'Unless requested by the minor concerning whom the petition has been filed and any parent or guardian present, the public shall not be admitted to a juvenile court hearing. The judge or referee may nevertheless admit such persons as he deems to have a direct and legitimate interest in the particular case or the work of the court.' " (20 Cal.3d at p. 622.) Relying on the legislative history the court concluded that "in vesting the judge with discretion to admit to juvenile court proceedings persons having a 'direct and legitimate interest in the particular case or the work of the court,' it was the purpose of the Legislature to allow press attendance at juvenile hearings." (*Id.*, at p. 623.)

In finding that the Legislature intended section 676 to give the court discretion to admit the press, the court in *Brian W.* noted that the language in section 676 was added in 1961 pursuant to a special study commission on juvenile justice. The commission explained that it was " 'proposing minor changes in the language of the law to make private hearings mandatory, unless the minor and/or his parents desire the public's presence. . . .' " (20 Cal.3d at p. 622.) However, the commission went on to state " 'we do not intend that this recommendation be used to exclude bonafide representatives of the press from attending juvenile court hearings. In so stating, we are convinced the press will continue to respect their voluntarily adopted code of ethics, whereby the names of juvenile offenders are not identified to the public. [¶] We believe the press can assist juvenile courts in becoming more effective instruments of social rehabilitation by providing the public with greater knowledge of juvenile court processes, procedures, and unmet needs. We, therefore, urge juvenile courts to *actively encourage greater participation by the press*. It is the feeling of the Commission that *proceedings of the juvenile court should be confidential, not secret.*' (Italics added.)" (*Id.*, at pp. 622-623.)

Dependency proceedings were not separated from other juvenile court proceedings until 1976 when article VI (§ 300 et seq.), including section 346, was added. Thus in 1961 when the commission made its recommendations and section 676 was amended, the section applied to both dependency

---

admitted to a juvenile court hearing. The judge or referee may nevertheless admit such persons as he deems to have a direct and legitimate interest in the particular case or the work of the court."

and delinquency proceedings. (See Historical Note to section 346, West's Ann. Welf. & Inst. Code (1984 ed.) p. 210: "This section was derived from § 676 insofar as that section related to dependent children.")

From this, it is readily apparent that the Legislature added section 346 to ensure not only that dependency proceedings remained private but also that the juvenile court in a dependency proceeding retained the same discretion to admit the press and other persons having a "direct and legitimate interest" as the court had under section 676. Accordingly the court's determination in *Brian W.* that the juvenile court has discretion under section 676 to admit members of the press applies equally to section 346.

Ordinarily, at this point we would proceed with a review of the court's order to determine whether it abused its discretion under section 346 in allowing real party access to the proceedings. However, critical to the proper consideration of that issue is the question of whether the press and the public have a constitutional right to attend juvenile court dependency proceedings.[4] We now proceed to that question.

## The First Amendment Right of Access

In the past decade, on four separate occasions, the United States Supreme Court has addressed the issue of whether the public has a First Amendment right to attend court proceedings. In *Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555 [65 L.Ed.2d 973, 100 S.Ct. 2814] (*Richmond Newspapers*), a plurality of the court held that the public enjoys a First Amendment right to attend criminal trials. In reaching this conclusion, the plurality noted that criminal trials historically have been public proceedings and that public criminal trials serve a number of societal values. Historically, open criminal trials "gave assurance that the proceedings were conducted fairly to all concerned, . . . discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality." (*Id.*, at p. 569 [65 L.Ed.2d at p. 984].) Open proceedings further "had significant community therapeutic value" by "providing an outlet for community concern, hostility, and emotion." (*Id.*, at pp. 570-571 [65 L.Ed.2d at pp. 985-986].) Finally, public trials provide an "opportunity both for understanding the system in general and its

---

[4]If public access to juvenile court proceedings is a constitutionally protected right, the juvenile court and this court must comply with the United States Supreme Court decisions which hold that the court cannot exclude the public absent a showing of an overriding compelling state interest and that any order of exclusion must be narrowly tailored to serve that interest. On the other hand, if the juvenile court's discretion under section 346 does not involve the balancing or consideration of constitutional rights, the state is free to develop a different rule for access to these proceedings.

workings in a particular case" thereby enhancing public confidence in the judicial system. (*Id.*, at p. 572 [65 L.Ed.2d at pp. 986-987].) Noting that this First Amendment right of access was a qualified right, the court held that a closed proceeding is permissible if closure is necessary to serve a specifically articulated overriding state interest and narrowly tailored to serve that interest. (*Id.*, at p. 581 [65 L.Ed.2d at pp. 992-993].)

Two years later, the court struck as unconstitutional a state statute mandating that the testimony of minor victims in criminal trials involving certain sex offenses be taken in closed proceedings. (*Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596 [73 L.Ed.2d 248, 102 S.Ct. 2613] (*Globe*).) The court reaffirmed its decision in *Richmond Newspapers* that the First Amendment guarantees the public a right of access to criminal trials. The court also determined that the state had a compelling interest in "safeguarding the physical and psychological well-being of a minor . . . ." It concluded, however, that this compelling interest did "not justify a *mandatory* closure rule . . . ." (*Id.*, at pp. 607, 608 [73 L.Ed.2d at pp. 257-258].) Such a statute is not narrowly tailored to serve that interest because it required closed proceedings even when it was unnecessary to protect the well-being of the minor victim. Accordingly, the issue of whether access can be denied during a criminal trial must be determined on a case-by-case basis.

Relying again on history and the value of public access, the court in *Press-Enterprise Co.* v. *Superior Court of Cal.* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819] (*Press-Enterprise I*), held that the public's constitutional right of access includes a right to attend the jury selection process in criminal trials. Again, however, the court indicated that this right is qualified and may be overcome by a showing of a compelling state interest. "The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain." (*Id.*, at p. 511 [78 L.Ed.2d at p. 639].) The court's order in *Press-Enterprise I* closing six weeks of jury selection voir dire and its refusal to release any portion of the court's voir dire transcript was found to be unconstitutional because it was not supported by articulated findings necessitating closure, was made without any showing that alternatives were unavailable and was not narrowly tailored to serve any compelling interest. (*Id.*, at p. 513 [78 L.Ed.2d at p. 640].)

Finally, in *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1 [92 L.Ed.2d 1, 106 S.Ct. 2735] (*Press-Enterprise II*), the court held that the First Amendment right of public access extended with equal force to preliminary

hearings in California. The court made this determination because such hearings traditionally have been public proceedings. Further, the preliminary hearing as conducted in California is a critical proceeding equivalent in many respects to the trial itself. In summarizing its prior decisions, the court in *Press-Enterprise II* said, "our decisions have emphasized two complementary considerations. First, because, a '"tradition of accessibility implies the favorable judgment of experiences" ' [citations], we have considered whether the place and process have historically been open to the press and general public. . . . [¶] Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. . . . [¶] . . . If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches." (*Id.*, at pp. 8-9 [92 L.Ed.2d at pp. 9-10].)

█ These cases, taken together, indicate that (1) the right of access does not extend automatically to every proceeding in court; (2) whether the right extends to a particular proceeding depends on whether the particular proceeding passes the tests of experience and logic (*Press-Enterprise II*); (3) if the right does apply to a particular proceeding, a statute mandating that such proceeding be closed is unconstitutional (*Globe*); and finally (4) if there is a constitutional right of access to a particular proceeding, any order closing all or part of that proceeding must be supported by articulated findings indicating that closure is necessary to serve an overriding and compelling state interest and that the order closing the proceedings is narrowly tailored to serve that interest. █ Here, as we explain, because the history of juvenile courts is one of closed proceedings, the constitutional right of access does not extend to these proceedings.

The first juvenile court in our country was established in 1899 in Illinois. (*In re Gault* (1967) 387 U.S. 1, 14 [18 L.Ed.2d 527, 87 S.Ct. 1428].) "The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was 'guilty' or 'innocent,' but 'What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career.' The child—essentially good, as they saw it—was to be made 'to feel that he is the object of [the state's] care and solicitude,' not that he was under arrest or on trial. The rules of criminal procedure were therefore altogether inapplicable. The apparent rigidities, technicalities, and harshness which they observed in both substantive and

procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive." (*Id.*, at pp. 15-16 [18 L.Ed.2d at p. 539], fns. omitted.) "Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context." (*Id.*, at p. 17 [18 L.Ed.2d at p. 540].)

Hearings in the juvenile court originally were intended to be informal, nonadversarial and private in the belief that this was more consistent with the rehabilitative goals of the juvenile court than were the traditional adversarial proceedings employed in the adult criminal court. (387 U.S. at pp. 26-27 [18 L.Ed.2d at pp. 545-546].) Further, one of the important goals to be derived by this "peculiar system" was the elimination of the social stigma and civil disabilities which derive from the label "criminal." (*Id.*, at pp. 17, 24 [18 L.Ed.2d at pp. 540, 544].) Thus, because of the "realization that publicity, with its attendant stigma, generally impedes integration of a youth into the community" (Note, *Rights and Rehabilitation in the Juvenile Courts* (1967) 67 Colum.L.Rev. 281, 285), one of the hallmarks of the juvenile justice system has been confidentiality ensured by private hearings. Since the goal of the juvenile system was rehabilitation, not punishment, "[t]he program, as envisaged, was to sacrifice the adult system's reliance on publicity as a deterrent in favor of a purely rehabilitative orientation." (*Id.*, at p. 286.)[5]

From the foregoing, it is clear and there can be no dispute that the history of the juvenile system has been one of private hearings, not public. This utter lack of any history or tradition of openness in juvenile proceedings has led a number of state courts to conclude that the constitutional right of access does not extend to juvenile proceedings. "Far from a tradition of openness, juvenile proceedings are almost invariably closed. All 50 states, in fact, have some sort of juvenile shield law to limit public access." (*In re J. S.* (1981) 140 Vt. 458 [438 A.2d 1125, 1127].) "[I]n their relatively brief history, it would appear that juvenile proceedings have been closed to the public. Therefore, we are unable to conclude that there is any historically-based constitutional presumption of openness applicable to juvenile-court

[5]California first adopted a juvenile court system in 1909. (Stats. 1909, ch. 133, p. 213.) From its inception in California, as was true in other states, the juvenile court hearing was intended to be informal, nonadversarial and private. (*Id.*, § 23, p. 224: "Any child shall be entitled to a private hearing upon the question of [his or her] dependency or delinquency, and upon the request of said child, or either of his parents or guardian, such hearing shall be had privately in the manner provided by law for private hearings at preliminary examinations. An order of court adjudging a child dependent or delinquent under the provisions of this act shall in no case be deemed to be a conviction of crime.")

proceedings." (*Florida Pub. Co.* v. *Morgan* (1984) 253 Ga. 467 [322 S.E.2d 233, 238].) "Juvenile proceedings are usually private." (*In re T.R.* (1990) 52 Ohio St.3d 6 [556 N.E.2d 439, 449].) "[J]uvenile proceedings have not been historically open." (*Matter of N.H.B.* (Utah App. 1989) 769 P.2d 844, 849; see also, *Edward A. Sherman Pub. Co.* v. *Goldberg* (R.I. 1982) 443 A.2d 1252, 1258; *Associated Press* v. *Bradshaw* (S.D. 1987) 410 N.W.2d 577, 578.[6])

Conceding that the history regarding our juvenile courts has been one of closed proceedings, real party contends that this history relates to juvenile delinquency proceedings and that the original reason for confidentiality and private hearings, i.e., protecting the juvenile *delinquent* from any stigma which might result from his delinquency does not apply in dependency proceedings. Real party also contends that because the values of open proceedings recognized in *Richmond Newspapers* through *Press-Enterprise II* apply to juvenile proceedings the constitutional right of access should extend to these proceedings as well.

With respect to the first contention, we believe real party's characterization of the purpose for private hearings is too narrow. While admittedly the early reformers were desirous of removing the stigma which derives from labelling a person's conduct as "criminal," the reason they desired to eliminate the stigma was because such stigma was inconsistent with the primary purpose and mission of the juvenile court. The system was designed not to punish but rather to rehabilitate the juvenile. "The Juvenile Court Law's purpose is to protectively rehabilitate juveniles and that the maintenance of confidentiality is a necessary corollary of that purpose." (*Wescott* v. *County of Yuba* (1980) 104 Cal.App.3d 103, 109 [163 Cal.Rptr. 385].) In other words, it was the belief that publicity from public proceedings was inconsistent with and would undermine rehabilitation which led to private hearings.

Moreover, private hearings were not intended to simply avoid publicity and its resulting stigma, but were also part and parcel of the informal and nonadversarial nature of juvenile court hearings. This again in turn was believed to be more appropriate to achieving rehabilitation. Private hearings thus, traditionally, have been considered an important tool in the juvenile court system, both in terms of eliminating or reducing any stigma which might attach and, more broadly, in assisting in the rehabilitative process. While the stigma, if any, faced by a dependent child may be less of a concern

---

[6] An Illinois court also concluded that the right of access does not extend to juvenile proceedings but the Illinois Supreme Court has granted review. (*In Interest of Minor* (1990) 205 Ill.App.3d 480 [150 Ill.Dec. 942, 563 N.E.2d 1069, 1074], appeal allowed (1991) 153 Ill. Dec. 370 [567 N.E.2d 328].)

in a dependency proceeding, this does not mean private hearings serve no purpose in the dependency case.

In a dependency proceeding the state steps into the role of parent on a temporary basis in order to protect the welfare of the child and, if possible, to maintain the parent-child relationship. Thus, section 202 provides that one of the purposes of the juvenile court law is "to preserve and strengthen the minor's family ties whenever possible" and that, if the child's removal from the parent's custody is necessary, a primary objective in the proceeding is the "reunification of the minor with his or her family." Thus, like delinquency proceedings, the dependency proceeding is intended to be rehabilitative—not punitive. (*In re La Shonda B.* (1979) 95 Cal.App.3d 593 [157 Cal.Rptr. 280].)

The Supreme Court has acknowledged that protecting the minor victim from further trauma and embarrassment which might result when the child is compelled to testify in public is a legitimate compelling state interest. (*Globe, supra,* 457 U.S. 596, 607 [73 L.Ed.2d 248, 257-258].) Further, children who must face their peers in school might be subjected to special pressures if the matter is publicized. (*Div. of Youth & Fam. Serv.* v. *J.B.* (1990) 120 N.J. 112 [576 A.2d 261, 269].) In our view, there can be little doubt that the embarrassment, emotional trauma and additional stress placed on the minor by public proceedings and the publicity engendered by public proceedings may well interfere with the rehabilitation and reunification of the family. Further, the parents of a dependent child face a potential social stigma from public proceedings which would further interfere with rehabilitation and reunification.

As an integral part of the rehabilitative process, private hearings in dependency proceedings assist in that process no less so than in delinquency proceedings. Accordingly, we reject real party's contention that because there is no stigma attached to a child in a dependency proceeding the need for confidentiality is less compelling.[7]

We agree with real party's second contention that public access may play a positive role in the proper functioning of the juvenile court. Although private hearings were and are intended to further the rehabilitative mission

---

[7]One court has suggested that the need for confidentiality is even more compelling in the context of dependency proceedings than in delinquency cases. (*In re T.R., supra,* 556 N.E.2d 439.) "The delinquent child is at least partially responsible for the case being in court; an abused, neglected, or dependent child is wholly innocent of wrongdoing. While the public arguably has an interest in delinquency proceedings which is analogous to its interest in criminal proceedings, . . . this interest is not present in abuse, neglect, and dependency proceedings." (*Id.,* at p. 449.)

of the juvenile system, the system has not operated effectively in all cases and has been criticized for its failings. To the extent public proceedings serve the twin goals of assuring fairness and giving the appearance of fairness, the societal values of public access first recognized in the criminal context can be beneficial to juvenile court proceedings as well.

The Supreme Court has repeatedly recognized that, in spite of the noble goals of the juvenile justice system, the reality often does not match the ideals. As early as 1966 the court acknowledged the deficiencies in the juvenile system at least with respect to delinquency proceedings. In *Kent* v. *United States* (1966) 383 U.S. 541, 556 [16 L.Ed.2d 84, 94-95, 86 S.Ct. 1045], the court said "[t]here is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." Again, in *In re Gault, supra,* 387 U.S. 1 [18 L.Ed.2d 527], the court noted that children often do not receive the "careful, compassionate, individualized treatment" originally contemplated by those who first fashioned the juvenile system. (*Id.,* at p. 18 [18 L.Ed.2d at p. 541].) Because of the "[f]ailure to observe the fundamental requirements of due process," the system is scarred by "unfairness to individuals and inadequate or inaccurate findings of facts and unfortunate prescriptions of remedy." (*Id.,* at pp. 19-20 [18 L.Ed.2d at pp. 541-542].)

"The Court, although recognizing the high hopes and aspirations of Judge Julian Mack, the leaders of the Jane Addams School and the other supporters of the juvenile court concept, has also noted the disappointments of the system's performance and experience and the resulting widespread disaffection. [Citations.] There have been, at one and the same time, both an appreciation for the juvenile court judge who is devoted, sympathetic, and conscientious, and a disturbed concern about the judge who is untrained and less than fully imbued with an understanding approach to the complex problems of childhood and adolescence. There has been praise for the system and its purposes, and there has been alarm over its defects." (*McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 534 [29 L.Ed.2d 647, 654-655, 91 S.Ct. 1976].) These observations, made first in the context of delinquency proceedings nearly 30 years ago, remain true today. Thus, in a recent report by the Commission on the Enforcement of Child Abuse Law (Apr. 1985), it was recognized that "the child victim is too frequently victimized again by the systems."

Out of recognition of these problems, the court has required that, at a minimum, juvenile court proceedings must accord with constitutional principles of due process and fundamental fairness. "In view of this, it would

be extraordinary if our Constitution did not require the procedural regularity and the exercise of care implied in the phrase 'due process.' Under our Constitution, the condition of being a boy does not justify a kangaroo court." (*In re Gault, supra*, 387 U.S. 1, 27-28 [18 L.Ed.2d 527, 545-547].) Public access may as well improve juvenile court practice and serve many, if not all of the societal values first recognized in the context of a criminal trial.

■ At the jurisdictional hearing in both dependency and delinquency cases, the court is engaged in a fact-finding process in attempting to determine whether the minor comes within the jurisdiction of the juvenile court. To the extent open proceedings discourage perjury and might encourage other witnesses to come forward which in turn leads to more accurate fact finding, public access to juvenile proceedings is beneficial. (*Richmond Newspapers, supra*, 448 U.S. 555, 569 [65 L.Ed.2d 973, 984-985], conc. opn. of Brennan, J., at pp. 596-597.)

Access may also serve to check judicial abuse. Because juvenile proceedings, in particular dependency proceedings, are civil in nature and intended to be rehabilitative instead of punitive, admittedly there is less concern of unjust convictions against which public access might serve as a check. (*Matter of N.H.B., supra*, 769 P.2d 844, 849.) However, other equally important and constitutionally guaranteed liberties may be unjustly infringed upon in these proceedings. ■ At risk are the parents' "constitutionally protected liberty [which] includes the right to 'bring up children' (*Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399, [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446]), and to 'direct the upbringing and education of children' (*Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1078, 45 S.Ct. 571, 39 A.L.R. 468]). (*In re Roger S.* (1977) 19 Cal.3d 921, 928 [141 Cal.Rptr. 298, 569 P.2d 1286].) As against the state, this parental duty and right is subject to limitation only 'if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.' (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 234 [32 L.Ed.2d 15, 35, 92 S.Ct. 1526].)" (*In re Scott K.* (1979) 24 Cal.3d 395, 406 [155 Cal.Rptr. 671, 595 P.2d 105], dis. opn. of Clark, J.) ■ Public access does serve as a check against judicial and governmental abuse or misuse of power which might result in unnecessary and unjust interference with these important liberties.[8]

---

[8] We acknowledge Justice White's observation in his concurring opinion in *McKeiver* v. *Pennsylvania, supra*, 403 U.S. 528, 552 [29 L.Ed.2d 647, 665], that "a system eschewing blameworthiness and punishment for evil choice is itself an operative force against prejudice and short-tempered justice." However, abuse is no less abuse even when benevolently motivated and unnecessary infringement of constitutional rights can occur even when thought to be in the best interests of the child. (See, e.g., *In re Raya* (1967) 255 Cal.App.2d 260, 267

As is true with shocking crimes generally, the crimes committed against and the neglect visited upon children often result in an understandable "community reaction of outrage and public protest . . . ." (*Richmond Newspapers, supra,* 448 U.S. 555, 571 [65 L.Ed.2d 973, 985-986].) Public access to juvenile dependency proceedings can serve "an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion." (*Ibid.*)

Finally, public access serves an important educative function which is no less compelling in the context of the juvenile court. The public's ability to understand how the system operates and, in turn, its ability make informed decisions regarding the need for positive changes to the system will be enhanced by allowing access to the proceedings. (*Matter of N.H.B., supra,* 769 P.2d 844, 849: "[P]ublic awareness and understanding of the juvenile court system . . . would promote public involvement in the governmental processes and might deter inappropriate actions on the part of some participants.") Accordingly, we believe that public access can play "a significant positive role in the functioning" of juvenile court dependency proceedings. (*Press-Enterprise II, supra,* 478 U.S. 1, 8 [92 L.Ed.2d 1, 9-10].)

Having reached this conclusion, we find ourselves at the crossroad. Applying the first prong of the court's test, the historical experience factor, the constitutional right of access does not appear to extend to these proceedings because openness inhibits rehabilitation. But application of the second prong, the societal values of openness, i.e., the logic factor, tends to support expanding the right to include access to juvenile proceedings because openness will expose defects in the system and contribute to their cure. The Supreme Court has not yet had occasion to address the issue of public access in this context. We can, however, find guidance from other decisions of the court.

Returning once again to those cases wherein the court has addressed the deficiencies in juvenile court proceedings, we find that notwithstanding the admitted failures of the system, the court has refused to compel the states to afford the juvenile in a delinquency proceeding all of the same rights to which he or she would be entitled in the adult criminal setting. "This concern

---

[63 Cal.Rptr. 252], fns. omitted, wherein the appellate court reversed the lower court's finding of dependency which was based on the mother's consensual, extramarital living arrangement: "There is a danger here of imposing standards adapted to the well-to-do, who can usually pay for the forms of legitimacy, and ill-adapted for the poor, who frequently cannot. Attempts to apply 'across the boards' standards to rich and poor alike may avoid a theoretical discrimination and create a practical one.")

[about the defects in the juvenile court system], however, does not induce us in this case to accept the invitation to rule that constitutional guaranties which would be applicable to adults charged with the serious offenses for which Kent was tried must be applied in juvenile court proceedings concerned with allegations of law violation." (*Kent* v. *United States, supra,* 383 U.S. 541, 556 [16 L.Ed.2d 84, 94].)

In rejecting the claim that a minor is constitutionally entitled to a jury trial, in *McKeiver* v. *Pennsylvania, supra,* 403 U.S. 528 [29 L.Ed.2d 647], the court said, "In this field, as in so many others, one perhaps learns best by doing. We are reluctant to disallow the States to experiment further and to seek in new and different ways the elusive answers to the problems of the young, and we feel that we would be impeding that experimentation by imposing the jury trial. The States, indeed, must go forward. If, in its wisdom, any State feels the jury trial is desirable in all cases, or in certain kinds, there appears to be no impediment to its installing a system embracing that feature. That, however, is the State's privilege and not its obligation." (*Id.,* at p. 547 [29 L.Ed.2d at p. 662].)

Finally we note that while the system has been criticized for its failings, at no time has the Supreme Court indicated that one of the reasons for its deficiencies is the lack of open proceedings. To the contrary the court has criticized the system for not maintaining adequately the confidentiality purportedly promised by the juvenile system (*In re Gault, supra,* 387 U.S. 1, 24 [18 L.Ed.2d 527, 544]: "[t]his claim of secrecy . . . is more rhetoric than reality") and has stated "there is no reason why, consistently with due process, a State cannot continue if it deems it appropriate, to provide and to improve provision for the confidentiality of records of police contacts and court action relating to juveniles." (*Id.,* at p. 25 [18 L.Ed.2d at p. 545].)

Finding a constitutional public right of access would necessarily mean that the proceeding constitutionally could not be closed unless the judicially created strict test for closure is met. This would require the juvenile court to articulate findings that the state's admittedly compelling state interest in protecting the child's physical and psychological well-being and rehabilitating the child is overriding in the specific case and to narrowly tailor any order closing the proceeding or portions thereof to serve that interest. (*Press-Enterprise Co. I, supra,* 464 U.S. 501, 510 [78 L.Ed.2d 629, 638-639].) Evaluating the potential harm and prejudice which might result to the state's interest from public access is an elusive process and certainly cannot be determined with exactitude. With the welfare of minors at stake, we are reluctant to impose the strict standard for closure required for a First

Amendment right unless compelled to do so by the United States Supreme Court. We find no such clear direction from the court.

Further, we agree with the court's support of the proposition that the states should remain free to continue their exploration for a system best-suited for addressing the problems encountered by our youth. A finding of a constitutional right of access may thwart or hamper that process by imposing rigid constraints on how, and under what circumstances, juvenile matters are handled. (*McKeiver* v. *Pennsylvania, supra*, 403 U.S. 528, 545 [29 L.Ed.2d 647, 661]: "[T]he jury trial, if required as a matter of constitutional precept, will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding.") Accordingly, we conclude that the First Amendment right of access does not extend to juvenile dependency proceedings.[9]

## The Court's Order

■ Having concluded that real party does not have a constitutionally protected right to attend the dependency proceedings in this case, we now determine whether the juvenile court abused its discretion in admitting real party and/or in conditioning its admittance to the proceedings.[10] In this case

---

[9]We have been able to locate only two decisions in which the constitutional right of access was found to apply to juvenile proceedings. In *Matter of Chase* (1982) 112 Misc.2d 436 [446 N.Y.S.2d 1000, 1002], the court held simply that the "historical and analytical bases for the public right of access in criminal trials pertain equally to civil proceedings." Similarly in *Div. of Youth & Fam. Serv.* v. *J.B., supra*, 576 A.2d 261, 267, the court did not discuss access to juvenile proceedings in particular but rather simply held that the right applies in civil cases generally.

Our reading of *Press-Enterprise II* leads us to conclude that the courts in *Chase* and *J.B.* were incorrect in their analysis. In *Press-Enterprise II*, the court clearly indicated that the two-prong analysis of experience and logic must be made with reference to the specific proceeding to which access is sought. "If the *particular* proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches." (*Press-Enterprise Co. II, supra*, 478 U.S. 1, 9 [92 L.Ed.2d 1, 10], italics added.) To conclude that the right extends to juvenile proceedings simply because they are "civil" in nature and without regard to the unique features and purposes of the juvenile system is too simplistic an approach which cannot stand in light of the test expressly set forth in *Press-Enterprise II*. "Little, indeed, is to be gained by any attempt simplistically to call the juvenile court proceeding either 'civil' or 'criminal.' The court carefully has avoided this wooden approach." (*McKeiver* v. *Pennsylvania, supra*, 403 U.S. 528, 541 [29 L.Ed.2d 647, 658].)

[10]In this analysis we place little significance on the fact that all of the parties to the proceeding—DPSS, the children and the parents—*objected* to the Sun's presence at the proceeding. In saying this, we do not mean to suggest that this court or the trial court should not consider the *best interests* of the child. Section 346 expressly authorizes the juvenile court to admit interested persons even though the parties have not requested an open proceeding. By the same token, section 346 authorizes the trial court to admit interested persons over the

we direct the juvenile court to vacate its order allowing press access primarily because apparently a significant reason, if not the sole reason, the juvenile court decided to allow the Sun to attend the proceedings was the court's misguided belief that allowing the press admittance would somehow afford the court an avenue through which it could control the publicity surrounding this case. Thus, although the court acknowledged that the juvenile system would benefit if there was greater public understanding, it also said, "I'm quite sensitive and troubled by the concept that somehow we're going to sacrifice the children. The exposure has been made, and I know that the realities of merely putting in the last names and giving the minor a new nickname—but you see, the exposure won't stop if I deny the motion. The exposure continues. I think that everyone in the courtroom will have to agree with that, and everyone in the courtroom will have to admit that I wouldn't have the power nor the constitutional jurisdiction to even attempt a gag order outside the courtroom. The only control I can gain is by allowing the press in." The court then ordered that the Sun would be allowed to attend the proceedings but conditioned that access by circumscribing what the newspaper could publish and the circumstances under and the manner in which it could interview various participants in the proceedings.

The juvenile court clearly was without the power to restrict the press's right to investigate and publish information which it has lawfully obtained. (*Oklahoma Publishing Co.* v. *District Court* (1977) 430 U.S. 308 [51 L.Ed.2d 355, 97 S.Ct. 1045]: the judiciary cannot prohibit the publication of a juvenile's name and picture when that information has been lawfully obtained by the media; see also, *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667].) Here the court, through its conditions, attempted to prohibit the publication of information without regard to how the press obtained the information. If the information was or is lawfully obtained, it is beyond the juvenile court's power to so restrain the press. Contrary to its statement that it did not have the power to make a "gag" order directed to the Sun, the court by imposing such conditions for access in effect restricted the Sun's right to have access to sources of information and to publish information lawfully obtained by it.

*objection* of the parties. Similarly while we give some deference to the expert's opinion that further publicity will interfere with reunification efforts, we note that the expert's opinion was sorely lacking in any substantive explanation as to how the Sun's presence at judicial proceedings will interfere with the reunification process. Even the expert's opinion that further publicity will interfere with that process was rather conclusory. We find of interest that the juvenile court expressly found that whether the newspaper is allowed access to the proceeding or not, the publicity will more than likely continue unabated. In light of the fact that the parents were facing criminal charges stemming from the same facts, it would appear that the juvenile court was correct since the criminal proceeding presumably was open to the public.

The court's condition regarding when and under what circumstances the Sun may interview participants in the proceeding such as the foster caretakers and mental health experts is an even more egregious interference with the freedom of the press and one for which we can find no support. By attempting to restrict the press's newsgathering ability, the condition strikes at the very heart of the press's constitutional rights.

The last condition purportedly prohibiting the press from doing anything in the future which might interfere with the reunification process is so vague and overboard that it too results in an unconstitutional infringement on the freedom of the press. While we appreciate the court's attempt to allow press access without "sacrificing the children," it went too far in its efforts. The conditions cannot stand.

We are cognizant that by striking these conditions, we must allow the juvenile court to re-exercise its discretion as to allowing the Sun access to the proceedings in this case. As it appears to us that the court's invalid conditional order allowing such access was guided by its belief that it could exercise a measure of control over the Sun, the court may well determine, upon reconsideration, that uncontrolled press access would be harmful to the minors. That, of course, is within the court's discretion.

■ We make the following observations to assist the court in exercising its discretion while at the same time avoiding any attempt to list all of the factors which may be considered. First, and foremost, the court's discretion must be directed at determining what is in the best interests of the minors, for that obviously is its primary concern at all times in the juvenile proceeding. At the same time, the court should give proper consideration to the important social values which are fostered by allowing public or press access to the proceedings. The Legislature in enacting section 346 has clearly endorsed the view that " 'the press can assist juvenile courts in becoming more effective instruments of social rehabilitation by providing the public with greater knowledge of juvenile court processes, procedures, and unmet needs.' " (*Brian W.* v. *Superior Court, supra,* 20 Cal.3d 618, 623.)

In attempting to balance these competing interests, the court should attempt to apply these broad principles to the unique facts of this case and may properly consider such factors as the age of each child, the nature of the allegations, the extent of the present and/or expected publicity and its effect, if any, on the children and on family reunification. (*Div. of Youth & Fam. Serv.* v. *J.B., supra,* 576 A.2d 261, 269.) Although not constitutionally required, the court should consider whether it would be feasible to allow

press access to portions of the proceedings and excluding the press from other portions.

After proper consideration of such factors and circumstances, the court should allow press access unless there is a reasonable likelihood that such access will be harmful to the child's or children's best interest in this case. (*Brian W.* v. *Superior Court, supra,* 20 Cal.3d 618, 624.) Some courts, although finding no constitutional right of access, have nonetheless employed the test for closure utilized by the court in *Richmond Newspapers* through *Press-Enterprise II.* (See, e.g., *Florida Pub. Co.* v. *Morgan, supra,* 322 S.E.2d 233, 238: "[T]he court must in an expeditious manner give the public or press an opportunity to present evidence and argument to show that the state's or juveniles' interest in a closed hearing is overridden by the public's interest in a public hearing.") As we have said, we find this test possibly too constraining in the juvenile court setting and constitutionally unnecessary. A "reasonable likelihood" standard provides sufficient flexibility for the unique issues in juvenile court while giving recognition to the values of open proceedings.[11]

## DISPOSITION

Let a peremptory writ issue directing the juvenile court to vacate its order granting the press a conditional right to attend the hearings in this proceeding.

Timlin, J., and McKinster, J., concurred.

---

[11]We need not decide at this time whether the juvenile court is required to make express findings in ruling on whether the press should be admitted or which party should bear the burden of proof on the issue.