780 So.2d 6 (2001)
The NATURAL PARENTS OF J.B., Petitioners,
v.
FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES, etc., Respondent.
No. SC96171.
Supreme Court of Florida.
February 22, 2001.
*7 Bruce Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, FL, for Petitioners.
Robert A. Butterworth, Attorney General, and Charles M. Fahlbusch, Assistant Attorney General, Fort Lauderdale, FL, for Respondent.
QUINCE, J.
We have for review a decision on the following question certified by the Fourth District Court of Appeal to be of great public importance:
IS SECTION 39.467(4), NOW SECTION 39.809(4), FLORIDA STATUTES (SUPP.1998), REQUIRING A MANDATORY CLOSURE OF ALL HEARINGS IN TPR PROCEEDINGS VALID UNDER THE UNITED STATES AND FLORIDA CONSTITUTIONAL PROVISIONS RESPECTING ACCESS OF THE PUBLIC AND MEDIA TO JUDICIAL PROCEEDINGS?
Department of Children & Family Services v. Natural Parents of J.B., 736 So.2d 111 (Fla. 4th DCA 1999). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
For the reasons expressed in this opinion, we conclude that section 39.467(4), Florida Statutes (1997), now section 39.809(4), Florida Statutes (2000), requiring mandatory closure of all hearings in termination of parental rights (TPR) proceedings is valid under the United States and Florida constitutional provisions respecting access of the public and media to judicial proceedings. Accordingly, we answer the certified question in the affirmative.

FACTS
The Department of Children and Family Services initially brought an action seeking a declaration that J.B., a minor child, was dependent and in need of care. The State alleged that the mother of the child suffers from Munchausen by Proxy Syndrome and intentionally caused her minor child to become so ill that she required numerous hospitalizations. Under section 39.507, Florida Statutes (1999), the adjudicatory hearing on a State's petition for dependency is required to be open to the public unless the judge orders the hearing closed upon determining that the public interest or the welfare of the child is best served by so doing.[1] The parents moved to close the dependency proceedings and to enjoin all concerned from releasing information about the proceeding to anyone, arguing that it was against the child's best interests to be exposed to the press and media. *8 The parents also filed a motion to impose a "gag" order to prohibit the release of any information. The trial court eventually denied the motions but without prejudice to the parents to move to close any further proceedings.
At some point, the State moved to permanently terminate parental rights. Because the character of the proceedings changed to a TPR proceeding, the requirements of section 39.467, Florida Statutes (1997),[2] became controlling. This statute provides in part: "All hearings involving termination of parental rights are confidential and closed to the public."[3] The parents then changed their position and alleged that the mandatory closure required by the TPR statute is unconstitutional and violates the Sixth and Fourteenth Amendments to the United States Constitution. They allege here that the statute violates both the United States and Florida Constitutions.[4]
The trial court declared section 39.467(4) facially overbroad and unconstitutional. The trial court reasoned that TPR proceedings should be treated like criminal prosecutions since the parents in a TPR proceeding face grave consequences. The trial court noted that the dependency proceedings were open as required by the dependency statute, and there had already been extensive media coverage.
The State filed a petition for certiorari, and the Fourth District quashed the trial court's order. The Fourth District began its analysis with the following "well-worn principles of constitutional adjudication":
Statutes are presumed to be valid and not unconstitutional. Courts are required to concede every presumption in favor of the validity of a statute. One who challenges the constitutionality of a statute has the burden of demonstrating its invalidity. Only a clear and demonstrated usurpation of power will authorize judicial interference with legislative action. It is therefore the duty of an appellate court to uphold the validity of a statute in all cases where that result can be lawfully reached.
Department of Children & Family Services v. Natural Parents of J.B., 736 So.2d at 113-14 (citations omitted). With those initial guidelines, the Fourth District held that the parents failed to meet their heavy burden of demonstrating the invalidity of this statutory provision. The Fourth District focused primarily on the Sixth Amendment and rejected the trial court and parents' criminal model for TPR proceedings. In so doing, the Fourth District refused to extend Sixth Amendment rights of the criminally accused, including the right to a public trial, to parents in TPR proceedings. The Fourth District added further that the Legislature has set the public policy of the state by including the mandatory closure language in the statute, that mandatory closure of TPR proceedings is consistent with other proceedings involving juveniles, and that mandatory closure falls within the exceptions to the general policy of openness enunciated in Barron v. Florida Freedom Newspapers, Inc., 531 So.2d 113 (Fla.1988). We agree with the decision and rationale of the Fourth District.

Closed Court Presumption in Juvenile Proceedings
Petitioners advocate that a presumption of openness should be extended *9 to TPR proceedings which, they argue, can only be overcome if the court determines on a case-by-case basis that the best interest of the child outweighs the public's right of access to the proceedings and that any such order of closure should be narrowly tailored to that end. "[I]n determining whether a particular proceeding is presumptively open, the Court examines whether the place and process have historically been open to the press and public and whether public access plays a significant role in the functioning of the process." In re N.H.B. 769 P.2d 844, 847 (Utah Ct.App.1989) (citing Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)). Petitioners present the lengthy history and rationale of the open court presumption in criminal cases. We agree with petitioners that criminal matters are traditionally open proceedings. However, we do not agree that the presumption of openness in criminal proceedings is or should be extended to juvenile proceedings.
The foundation of the juvenile system is to "`preserv[e] and promot[e] the welfare of the child,' which makes a juvenile proceeding fundamentally different from an adult criminal trial." Schall v. Martin, 467 U.S. 253, 263, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (citation omitted). Although juvenile proceedings are civil proceedings, Ostrum v. Department of Health & Rehabilitative Services, 663 So.2d 1359 (Fla. 4th DCA 1995), and although the presumption of openness has generally been extended to civil proceedings, juvenile proceedings have historically been closed to the public in furtherance of the overriding interest in, among other things, protecting the child from stigma, publicity, and embarrassment and promoting rehabilitation.
It is a hallmark of our juvenile justice system in the United States that virtually from its inception at the end of the last century its proceedings have been conducted outside of the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity. See H. Lou, Juvenile Courts in the United States 131-133 (1927); Geis, Publicity and Juvenile Court Proceedings, 30 Rocky Mt.L.Rev. 101, 102, 116 (1958).
Smith v. Daily Mail Pub. Co., 443 U.S. 97, 107, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (Rehnquist, J., concurring). All fifty states have some form of shield law to limit public access to proceedings involving juveniles. Id. at 99, 99 S.Ct. 2667. We have found no case that holds that the presumption of openness is a constitutional requirement in the context of juvenile proceedings. Indeed, the history of the juvenile justice system indicates the contrary, that it is in the best interest of the child to protect the child from publicity in certain proceedings and that this protection outweighs the public's right to access. We do not agree with petitioners that in TPR proceedings a presumption of openness is constitutionally required. A presumption that juvenile proceedings be closed to the public is consistent with the history and tradition of the juvenile justice system and furthers the sound and practical purposes of that system.

Mandatory Closure
Petitioners argue that closing court proceedings to the public is constitutional only if there is a compelling government interest to do so and only if closure is narrowly tailored to further that interest. While petitioners do not dispute the compelling government interest in confidential juvenile proceedings, they do argue that mandatory or per se closure of juvenile proceedings is not narrowly tailored.
Only in those proceedings found to be presumptively open, however, is it necessary for the court to make specific findings "demonstrating that `closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13-14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (quoting Press-Enterprise *10 Co. v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Thus, where there is no presumption of openness, there is no need for specific findings demonstrating that closure is essential and narrowly tailored. Because there is no presumption of openness in TPR proceedings, a mandatory closure requirement does not unconstitutionally limit the public's right of access to the proceedings. Thus, mandatory closure of proceedings that have no presumption of openness is constitutionally valid.
Petitioners rely heavily on Barron v. Florida Freedom Newspapers, 531 So.2d 113 (Fla.1988). In Barron, we held that there is a strong presumption of openness in both criminal and civil proceedings and we relied in part upon Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 n. 17, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), wherein Chief Justice Burger stated: "[H]istorically both civil and criminal trials have been presumptively open." As we do herein, in Barron we considered the history and tradition of open proceedings in the civil context. In so doing, we recognized certain exceptions to the presumption of openness in judicial proceedings. We set forth certain factors to be considered by courts before closing certain civil proceedings, and held that closure of certain proceedings should occur when necessary
(a) to comply with established public policy set forth in the constitution, statutes, rules or case law; (b) to protect trade secrets; (c) to protect a compelling governmental interest [e.g., national security; confidential informants]; (d) to obtain evidence to properly determine legal issues in a case; (e) to avoid substantial injury to innocent third parties [e.g., to protect young witnesses from offensive testimony; to protect children in a divorce]; or (f) to avoid substantial injury to a party by disclosure of matters protected by a common law or privacy right not generally inherent in the specific type of civil proceeding sought to be closed.
Barron, 531 So.2d at 118. Most importantly, however, in Barron, we recognized that the Florida Legislature expressly made certain proceedings confidential by statute as a matter of public policy, id. at 119, and we specifically excepted such proceedings from the presumption of openness. By the time this Court decided Barron in 1988, we had already upheld the constitutionality of the mandatory closure statute in adoption proceedings. In re Adoption of H.Y.T., 458 So.2d 1127 (Fla. 1984). Our decision today is consistent with our decision in Barron. Approving the Fourth District and upholding the constitutionality of section 39.809(4) complies with established public policy set forth in the statutes and case law and is consistent with the historical and traditional presumption of closed juvenile proceedings.
TPR proceedings are not the only proceedings the Florida Legislature has required by statute to be closed as a matter of public policy. Adoptions (section 63.162, Florida Statutes (1999)), actions establishing parental status in situations of gestational surrogacy (section 742.16, Florida Statutes (1999)), and hearings for appointment of a guardian ad litem (section 29.827, Florida Statutes (1999)), are also required to be closed proceedings.[5] There are other situations where the court is given discretion to close the proceedings, such as in the case of paternity actions (section 742.031, Florida Statutes (1999)). As stated above, this Court upheld the constitutionality of mandatory closure for adoption proceedings in In re Adoption of H.Y.T.
In H.Y.T., the press, like the parents in this case, challenged the mandatory closure of adoption proceedings, arguing that the mandatory nature of the closure was overbroad and a violation of the First Amendment right to public access. We held that the best interest of the child and the public policy of protecting the parties' *11 privacy in adoption proceedings outweighed the interest the public might have in having access to the proceedings. We further noted that in such proceedings, the court itself takes an interest in the case and serves to protect the best interest of the child. This is a departure from the court's typical disinterested position. The Second District followed the rationale of H.Y.T., when it declared a similar statute mandating the closure of certain dependency proceedings to be constitutional. See Mayer v. State, 523 So.2d 1171 (Fla. 2d DCA 1988).
Petitioners argue that adoptions differ from TPR proceedings because TPR proceedings are adversarial in nature whereas adoptions are not. While the parents in a TPR proceeding may perceive the dissolution of their parental rights as a sanction, the purpose of the TPR proceeding is not to punish the parents. The paramount concern of the Court and the Legislature is the health and safety of the child or children involved. See § 39.001(1)(b)1, Fla. Stat. (1999). Because of this overriding concern, the mandatory closure of certain proceedings involving children is not an unconstitutional limitation on First Amendment freedoms.

Consistency with Other Statutes
Petitioners argue that the statute's intended purpose is undermined by the fact that there is no mandatory closure provision in the statute providing the procedure for adjudication of dependency actions. Petitioners argue that most TPR proceedings are initiated as dependency cases. If there is no closure order at the dependency phase, there may already have been significant publicity by the time TPR proceedings are instituted. Petitioners argue that the better view would be a presumptively open proceeding that is only closed after a particularized showing is made that such closure is justified. This argument was asserted in H.Y.T. We did not find this argument compelling then, and do not find this argument compelling now. We do not believe the Legislature intended that the child bear the burden of proving the need for confidentiality in TPR proceedings, which is why the Legislature removed the discretion from the court. As we held in H.Y.T., petitioners' argument "attempts to lay on the shoulders of the child the burden of proving a need for the protection the people of the state, through the legislature, have attempted to afford parties to an adoption." H.Y.T., 458 So.2d at 1129.
Inconsistent though the dependency and TPR statutes may be, neither is unconstitutional.
Where a statute does not violate the federal or state Constitution, the legislative will is supreme, and its policy is not subject to judicial review. The courts have no veto power, and do not assume to regulate state policy; but they recognize and enforce the policy of the law as expressed in valid enactments, and decline to enforce statutes only when to do so would violate organic law.
City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. 769, 772 (1914).

Conclusion
We approve the decision of the Fourth District and answer the certified question in the affirmative. Section 39.467(4), now section 39.809(4), Florida Statutes (2000), requiring mandatory closure of all hearings in TPR proceedings, is valid under the United States and Florida constitutional provisions respecting access of the public and media to judicial proceedings. There is no constitutional requirement that juvenile proceedings be presumptively open to the public. The Legislature has validly declared that the public policy of the State requires the mandatory closure of TPR proceedings. Because there is no presumption of openness in juvenile proceedings, and because none is constitutionally required, there is no requirement that an order of closure be made only after a case-by-case determination. Petitioners have failed to meet their heavy burden to overcome the presumption in favor of the *12 validity of the statute and have failed to demonstrate that the statute clearly and unconstitutionally usurps the public's right of access to TPR proceedings.
It is so ordered.
WELLS, C.J., and SHAW, HARDING and LEWIS, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which PARIENTE, J., concurs.
PARIENTE, J., dissents with an opinion, in which ANSTEAD, J., concurs.
ANSTEAD, J., dissenting.
While I agree with the majority that the press and public do not have a qualified right of access to termination proceedings, I cannot agree to approving a provision for mandatory closure for all such proceedings without conducting a full constitutional analysis. I believe the better approach would be to take the statute as creating a presumption in favor of closure but permitting the trial court to consider all relevant circumstances, and then balance the competing interests in such cases before closure may be ordered.
The majority begins its analysis by finding that juvenile proceedings have been historically closed to the public, and therefore no qualified right of access exists for the termination of parental rights proceedings. However, the majority then makes a giant leap in concluding that a mandatory closure of termination proceedings is constitutionally valid:
[W]here there is no presumption of openness, there is no need for specific findings demonstrating that closure is essential and narrowly tailored. Because there is no presumption of openness in TPR proceedings, a mandatory closure requirement does not unconstitutionally limit the public's right of access to the proceedings. Thus, mandatory closure of proceedings that have no presumption of openness is constitutionally valid.
Majority Opinion at 10. In my view, such a summary analysis is incomplete. In other words, just because juvenile proceedings focusing on the dependency or delinquency of the juvenile have been historically closed does not automatically permit the mandatory denial of public access to other, distinct court proceedings where the conduct of adult parents is the focus and the rights of those parents are being adjudicated on a permanent basis.
In fact, other states have considered this precise issue and concluded that a mandatory rule cannot withstand constitutional scrutiny even when applied to juvenile proceedings. For example, in Florida Publishing Co. v. Morgan, 253 Ga. 467, 322 S.E.2d 233 (1984), the Georgia Supreme Court held that mandatory closure of juvenile delinquency proceedings was unconstitutional. See id. at 238. There, the issue before the court was whether a statute which required that all juvenile court hearings be closed to the public was constitutional. See id. at 235. Like the majority opinion in this case, the Georgia Supreme Court found that juvenile proceedings have historically been presumptively subject to closure. However, the Georgia Supreme Court declined to conclude that mandatory closure was constitutional:
The holdings [of the United States Supreme Court] create a presumption that criminal trials will be open to the public. As we have previously stated, part of the rationale of these holdings is that, at English common law and in Colonial America, trials have been open to the public for reasons which, throughout history, have fostered and continue to foster a role for the judiciary appropriate to our scheme of constitutional government.
However, in their relatively brief history, it would appear that juvenile proceedings have been closed to the public. Therefore, we are unable to conclude that there is any historically-based constitutional presumption of openness applicable to juvenile-court proceedings. *13 This, however, does not mean that the absolute closure of juvenile-court hearings passes constitutional muster.
From the various cited cases, we conclude that, consistent with the Constitution, the state may create a rule that delinquency, deprivation, and unruliness hearings in juvenile court are presumed closed to the public (and press). However, for constitutional reasons, this presumption cannot be conclusive. The public and/or press must be given an opportunity to show that the state's or juveniles' interest in a closed hearing is not "overriding" or "compelling."
. . . .
We, therefore, hold that where a member of the public or press institutes a judicial proceeding to require the opening of a juvenile hearing, the court must in an expeditious manner give the public or press an opportunity to present evidence and argument to show that the state's or juveniles' interest in a closed hearing is overridden by the public's interest in a public hearing.
Id. at 237-38 (emphasis added); see also In re N.H.B., 769 P.2d 844, 852 (Utah Ct.App.1989) (holding that the presumption of closure of juvenile proceedings is not irrebuttable because of constitutional considerations).
Similarly, the Supreme Court of New Jersey has held that although juvenile proceedings are presumed closed, it does not "equate with a mandatory rule" of closure:
The compelling state interest in protecting victims of child abuse from the embarrassment of testifying in an open courtroom, with the attendant possibility of media coverage, justifies a presumption that [child neglect and abuse] proceedings initiated under Title 30 or Title 9 will be closed to the public. The presumption of closure does not, however, equate with a mandatory rule. Members of the public, including the press, must be free to make application to the trial court to be permitted to attend [these] proceedings. Under those circumstances, the court must balance the public's right of access to judicial proceedings against the State's interest in protecting children from the possible detrimental effects of revealing to the public allegations and evidence relating to parental neglect and abuse.
New Jersey Div. of Youth & Family Servs. v. J.B., 120 N.J. 112, 576 A.2d 261, 269 (1990) (emphasis added).[6] I believe that the balancing test developed by these courts and others is the better approach for evaluating the closure issue presented here consistent with the United States Supreme Court precedent on this issue.
Indeed, this Court has recognized and applied a similar balancing approach in evaluating the closure of judicial proceedings. In Barron v. Florida Freedom Newspapers, Inc., 531 So.2d 113 (Fla. 1988), for example, in the domestic litigation context, we stated that "a strong presumption of openness exists for all court proceedings." Id. at 118 (emphasis added). We stressed that before ordering closure, "the trial court shall determine that no reasonable alternative is available to accomplish the desired result, and, if none exists, the trial court must use the *14 least restrictive closure necessary to accomplish its purpose." Id.[7]Barron provides a basic framework for analysis that can be applied here.
It is true that this Court has upheld the constitutionality of a statute which mandated closure of adoption proceedings. See In re Adoption of H.Y.T., 458 So.2d 1127, 1129 (Fla.1984). While this Court in H.Y.T. did not articulate a definitive balancing test in our opinion, it is apparent that in our analysis and resolution of the case we clearly weighed the press's right of access to the courts against the state's interest in protecting the child. We reasoned that adoption proceedings are "qualitatively different from other judicial proceedings" because the court's primary duty is to protect the best interests of the child. See id. at 1128. We further found that the media's freedom was only minimally impaired, and that the impairment only affected matters of limited newsworthiness rather than matters of genuine public concern. See id. at 1129.
The majority opinion here recognizes that in H.Y.T. we weighed the best interests of the child against the public interest in adoption proceedings, yet the majority fails to include in its analysis a consideration of the parents' or the public's interest in these termination proceedings. Rather, without so much as a mention of the parents' or the public's right of access to the courts, or the fact that other proceedings involving the same issues may be open, the majority simply concludes that the state's interest in protecting the child is an "overriding concern" and thus mandatory closure "is not an unconstitutional limitation on First Amendment freedoms." Majority Opinion at 11. To hold as the majority does without at least considering the competing interests and other relevant circumstances ignores our constitutional precedent.
We cannot ignore that there are strong policy concerns which support open proceedings and that Florida public policy and law has traditionally favored open proceedings. One valid factor to be considered here would be the extent to which the proceedings and the evidence to be produced have already been disclosed to the public. In addition, the severity and finality of the relief sought by the State against the parents is obviously a valid factor to be considered and weighed. "[P]arental termination decrees are among the most severe forms of state action." M.L.B. v. S.L.J., 519 U.S. 102, 128, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). In this regard, some courts recognize that public access to termination proceedings may logically be invoked as a check against abuse of judicial and governmental power. See San Bernardino County Dep't of Pub. Soc. Servs., 283 Cal.Rptr. at 341 ("Public access does serve as a check against judicial and governmental abuse or misuse of power which might result in unnecessary and unjust interference with [a parent's constitutional right to raise and educate his or her child].")[8]; In re N.H.B., 769 P.2d at 849. The parents contend that it is patently unjust and an appearance of unfairness to take a parent's child away forever in secret proceedings. Indeed, some contend that without openness, even traditional juvenile proceedings "have the potential to become `little more than kangaroo courts, where judges rubber-stamp agency requests.'" *15 Jan L. Trasen, Privacy v. Public Access to Juvenile Court Proceedings: Do Closed Hearings Protect the Child or the System?, 15 B.C. Third World L.J. 359, 362 (1995) (quoting Sandy Bauers, Fighting to Lift Veil on Child Welfare, Philadelphia Inquirer, Aug. 15, 1993, at E1).[9]
Finally, Trasen suggests that without public scrutiny, neither parents nor the public would have recourse against incompetence or carelessness of caseworkers. See id. at 381-83. Hence, without some protection during the course of the juvenile proceedings, including the benefit of public scrutiny, the action of the State may go uncorrected. In other words, if such proceedings are mandatorily closed, there will be little or no check on caseworkers or their decisions.[10]See generally In re N.H.B., 769 P.2d at 849 (acknowledging that publicity of juvenile court system would "promote public involvement in the governmental processes and might deter inappropriate actions on the part of some participants").
While I recognize that public access to termination proceedings must be carefully considered due to the sensitive nature of the dispute, the potential harm to the children in any given case is almost always complex and difficult to analyze and predict. Further, while closure may frequently result, the interests of the parents and the public should, at a minimum, be considered before any decision is made on whether the proceedings should be closed. Based on the policy and constitutional considerations set out above, I conclude that the statute at issue here should not be construed to provide mandatory closure merely because juvenile proceedings have been historically closed to the public. Rather, in my view the sounder approach would be to construe the closure statute as creating a presumption in favor of closure, while still permitting courts to determine access on a case-by-case basis.
PARIENTE, J., concurs.
PARIENTE, J., dissenting.
I concur with Justice Anstead's view that a mandatory closure requirement in termination of parental rights proceedings, under the circumstances of this case in particular, may be constitutionally infirm. As we underscored in Barron, "the court must balance the rights and interests of the parties to the litigation with those of the public and press." Barron v. Florida Freedom Newspapers, 531 So.2d 113, 118 (Fla.1988). Further, although termination of parental rights ("TPR") proceedings are not criminal proceedings, TPR proceedings constitute state-initiated actions that implicate fundamental liberty interests protected by the Fourteenth Amendment. See generally M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996); *16 Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
Under the present statutory scheme, there is a presumption of openness that governs dependency proceedings. Only when the focus shifts to the permanent and irrevocable termination of the parents' constitutionally protected rights does the mandatory closure provision apply, raising a question of the logic and fairness of the current statutory scheme. The result is that every TPR proceeding is closed, without a requirement of a weighing of the interests involved.
If statutorily mandated closure is prompted by the best interest of the child, then it does not appear logical for the closure to become mandatory only after the dependency proceedingwhen the focus shifts to whether the parents' rights should be terminated. As the trial court in this case noted, some dependency proceedings are open to the public, and often involve "much of the same information" as TPR proceedings. Department of Children & Family Servs. v. Natural Parents of J.B., 736 So.2d 111, 113 (Fla. 4th DCA 1999). I do not then understand how the best interests of the child are served by closing the proceedings only after the focus of the proceedings turns to the termination of the parents' rights.
I also question the assumption underlying the majority opinion that all juvenile proceedings in this State historically have been closed to the public. See majority op. at 9. The term "juvenile proceedings" broadly encompasses both juvenile dependency and juvenile delinquency proceedings. See generally Fla. R. Juv. P., Pt. I (Delinquency Proceedings); Pt II (Dependency and Termination of Parental Rights Proceedings).
Only fifty years ago, the Legislature enacted chapter 39, Florida Statutes (1951), generally known as the Juvenile Court Act. See ch. 26880, Laws of Fla. (1951). At that time, this legislation made no distinction between dependency proceedings and TPR proceedings. Section 39.09, which applied to all juvenile proceedings, provided in part:
Only the child involved in the case, the parents or legal custodians of the child, their attorneys, and such other persons as they may request or the judge may direct, shall be permitted to be present.
§ 39.09(2), Fla. Stat. (1951) (emphasis added). Although section 39.09 underwent a series of legislative changes over the years, I find it significant from a historical perspective that, at least fifty years ago, there was no mandatory closure of chapter 39 proceedings in this State and that instead, the judge determined the extent of the closure.
Moreover, the majority acknowledges that even at the present time not all juvenile proceedings under chapter 39 are closed. See majority op. at 11. Significantly, there is a statutory presumption of openness in dependency proceedings subject to a judicial decision to "close any hearing to the public upon determining that the public interest or the welfare of the child is best served by so doing." § 39.507(2), Fla. Stat. (Supp.1998) (formerly section 39.408(2)(c)) (emphasis added). Dependency proceedings are the necessary predicate to TPR proceedings. However, section 39.809(4), Fla. Stat. (Supp.1998) (formerly section 39.467(4)), provides for mandatory closure of all hearings involving the termination of parental rightswithout regard to whether the preceding dependency action was open or closed.
This case highlights the fallacy of the bifurcated statutory scheme in its present form, in which dependency proceedings are presumptively open, yet TPR proceedings are mandatorily closed. Because the dependency portion of the proceeding in this case was open to the public, extensive media attention already existed.[11]See id. at 113. The trial court found that the TPR *17 proceedings should be open in this case. The trial court "specifically took notice of the extensive media attention to which this case has already been subjected and concluded that the prior media scrutiny `severely undermines any privacy interests the state or the minor child might have.'" Id.
Because of the extensive publicity that already occurred due to the open dependency proceedings,[12] it is difficult to envision how mandatory closure at this stage of the proceedings would promote the best interests of the child. Further, the parents, whose rights were being terminated, affirmatively requested that the TPR proceedings remain open.
For all these reasons, in order to pass constitutional muster under our decision in Barron, the decision to close TPR proceedings should be vested in the sound discretion of the trial court on a case-by-case basis, just as it is in dependency proceedings. An appropriate balance must be struck among the many interests to be consideredthe potential harm to the child, the rights of the parents, the right of public access and the promotion of fairness and public confidence in the judicial system.
ANSTEAD, J., concurs.
NOTES
[1] Section 39.507(2), Florida Statutes (1999), provides:

(2) All hearings, except as provided in this section, shall be open to the public, and a person may not be excluded except on special order of the judge, who may close any hearing to the public upon determining that the public interest or the welfare of the child is best served by so doing. The parents or legal custodians shall be allowed to obtain discovery pursuant to the Florida Rules of Juvenile Procedure, provided such discovery does not violate the provisions of s. 39.202. Hearings involving more than one child may be held simultaneously when the children involved are related to each other or were involved in the same case. The child and the parents, caregivers, or legal custodians of the child may be examined separately and apart from each other.
[2] See § 39.809(4), Fla. Stat. (2000).
[3] Section 39.809(4), Florida Statutes (1999), provides:

(4) All hearings involving termination of parental rights are confidential and closed to the public. Hearings involving more than one child may be held simultaneously when the children involved are related to each other or were involved in the same case. The child and the parents may be examined separately and apart from each other.
[4] "In all criminal prosecutions, the accused shall enjoy the right to a ... public trial...." U.S. Const. amend. VI. "In all criminal prosecutions the accused shall, upon demand ... have a ... public trial...." Art. I, § 16(a), Fla. Const.
[5] This list is not exhaustive.
[6] Other courts have fashioned standards to be applied by trial courts when determining whether to admit the press and public in juvenile proceedings. See, e.g., San Bernardino County Dep't of Pub. Soc. Servs. v. Superior Court, 232 Cal.App.3d 188, 283 Cal.Rptr. 332, 345 (1991) (finding that the press should be allowed access to juvenile proceedings unless there is a reasonable likelihood that access would be harmful to the child's best interest); In re T.R., 52 Ohio St.3d 6, 556 N.E.2d 439, 451 (1990) (finding that the trial court must determine that there is a reasonable and substantial belief that the child will be harmed, and that the harm outweighs the benefits of public access before closing a juvenile proceeding). The Ohio Supreme Court has recognized that "[a] proper standard is one which gives due deference to both the limitations of our ability to predict harmful consequences which may result from public access and the public's interest in learning about and scrutinizing the working of the juvenile court." In re T.R., 556 N.E.2d at 451.
[7] In so holding, this Court noted that the Florida Legislature had expressly made adoptions, paternity and juvenile proceedings confidential. See id. at 119.
[8] Despite this acknowledgment, the California Court of Appeal held that the First Amendment right of access to the courts does not extend to juvenile proceedings. See id. at 343. Nevertheless, the court left to the trial court's discretion the decision of whether to allow public access to juvenile proceedings. See id. at 345. In making this determination, the trial court must weigh the social values gained from public access against the best interests of the minor child. See id. After weighing these factors, the court held that the trial court should allow public access "unless there is a reasonable likelihood that such access will be harmful to the child's or children's best interest" in the case. Id.
[9] Thus, it is not surprising that some courts have recognized that public access to the courts may play a significant role in the functioning of the juvenile system. See San Bernardino County Dep't of Pub. Soc. Servs., 283 Cal.Rptr. at 342; see also Trasen, supra, at 381 (noting that public access can serve an important function by raising community awareness and involvement in the juvenile courts). The California Court of Appeal acknowledged that to the extent that open proceedings lead to more accurate fact finding, public access serves a vital and beneficial role in juvenile proceedings. See San Bernardino County Dep't of Pub. Soc. Servs., 283 Cal.Rptr. at 341.
[10] Further, some have claimed that without public scrutiny, parents of low means, especially, may have little chance of protecting their rights against mistaken allegations and the power of the State. In fact, some parents have looked to the media in an effort to even the playing field. See generally Trasen, supra, at 378 (citing Ernst v. Children & Youth Servs., 1993 WL 343375 (E.D.Pa.1993), aff'd in part, rev'd in part, 108 F.3d 486 (3d Cir. 1997), where the grandmother sought media attention in an effort to expose the shortcomings of the child welfare agency and the judicial process). Trasen also points to In re T.R., where the mother turned to the media in an effort to protect her children because she lacked the money, power, and position to litigate against the agency. See Trasen, supra, at 378.
[11] Ironically, the trial court opened the dependency proceeding against the wishes of the parents, who sought to have the dependency proceeding closed for fear of "leaks and gossip." Parents of J.B., 736 So.2d at 112.
[12] Apparently there were also criminal proceedings involving the same allegations that were also open to the public.